[No. S092653. May 6, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTINE LOYD, Defendant and Appellant.

**COUNSEL**

Jo Anne Keller for Defendant and Appellant.

Kenneth I. Chapman, Public Defender (Ventura) and Michael C. McMahon, Chief Deputy Public Defender, for California Public Defender Association

and the Public Defender of Ventura County as Amici Curiae on behalf of Defendant and Appellant.

Alan L. Schlosser for American Civil Liberties Union of Northern California as Amicus Curiae on behalf of Defendant and Appellant.

John T. Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón, Bridget Billeter and William Kuimelis, Deputy Attorneys General, for Plaintiff and Respondent.

George Palmer; Thomas J. Orloff, District Attorney (Alameda) and A. Mark Hutchins, Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

---

**OPINION**

**BROWN, J.**—In this case we consider whether secretly monitoring and recording an inmate's unprivileged jail conversations with her visitors, solely for the purpose of gathering evidence, constituted prosecutorial misconduct by violating *De Lancie v. Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142] (*De Lancie*). Because we decide *De Lancie* had been superseded by statute at the time of the taping, we find the prosecutor's request for and use of the tape did not constitute misconduct under state law.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Christine Loyd was convicted by jury of two counts of first degree murder (Pen. Code, § 187)[1] and one count of arson (§ 451, subd. (c)), and was sentenced to prison for a term of 55 years to life.

Before her trial began, defendant sought a ruling on the legality of the taping of defendant's personal visits and telephone calls.[2] After the prosecution noted defendant's motion failed to request a remedy, defendant formally moved for dismissal of the charges or recusal of the prosecutor. Defendant

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] Our decision today concerns the effect of only California law. As Justice Moreno's concurring opinion observes, there may be a federal basis, the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2510 et seq.), for suppressing the tapes of the telephone conversations. The federal law, however, has not been the basis of defendant's motions or

alleged the prosecutor violated the rule of *De Lancie, supra,* 31 Cal.3d 865, which bars monitoring of inmate conversations unless necessary for security purposes.

The parties stipulated to certain facts. Defendant was in jail awaiting trial for the murder of Virginia Baily. The prosecutor requested the recording of defendant's conversations with her nonattorney visitors. In response to this request, the sheriff's department provided the prosecutor with tapes of conversations between defendant and three visitors, Kristen Albertson, Dave DeWolf and Ann Argabrite. The prosecutor also requested and received tapes of telephone conversations defendant had with her brother, Philip Loyd, and with Ann Argabrite. The recorded communications occurred between March 26, 1996, and June 30, 1996. There was no taping of any conversation between defendant and her attorney or anyone retained by her attorney. The prosecutor requested this taping to gather evidence for the prosecution of Virginia Baily's murder, and to gain an indictment and subsequently prosecute defendant for the murder of her mother, Myrtle Loyd.

The trial court denied defendant's suppression motions. The jury convicted defendant on both counts of murder and on one count of arson. Defendant appealed.

The Court of Appeal discussed our *De Lancie* decision at length. The court noted *De Lancie* arose out of a civil suit seeking declaratory and injunctive relief from what had been the routine practice of recording conversations between inmates and visitors. Prior to *De Lancie,* we had recognized a right of confidentiality only for protected communications, like those between an inmate and counsel. (*North v. Superior Court* (1972) 8 Cal.3d 301, 308-311 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155] (*North*); see also § 636 [forbidding eavesdropping on communications between inmate and attorney, religious adviser or physician].) In *De Lancie, supra,* 31 Cal.3d at page 868, however, we concluded former sections 2600 and 2601 extended the protection of confidentiality to unprivileged communications, unless monitoring was necessary for the security of the institution or the public.

The Court of Appeal noted the difficulty involved in applying *De Lancie.* "The decision in *De Lancie* may well have raised more questions than it answered, including the nature and origin of the right protected, the extent to which it depends on the subjective expectations of prisoners and visitors, the extent to which it is subject to modification or abolition by legislative action,

---

appeals, the Court of Appeal decision or our grant of review. We therefore express no opinion on its applicability.

and—of foremost importance here—the nature of the remedy, if any, to be granted by a trial court presiding over a criminal prosecution in which the prosecutor has recorded the defendant's conversations in violation of *De Lancie*."

The Court of Appeal opinion also noted the concerns of the *De Lancie* dissenters. "[T]he practice of monitoring an inmate's conversations is (1) reasonably necessary to maintain jail security, and (2) that a person incarcerated in a jail or prison possesses no justifiable expectation of privacy." (*De Lancie, supra*, 31 Cal.3d 865, 879 (dis. opn. of Richardson, J.); see *id.* at p. 882 (dis. opn. of Mosk, J.).) Justice Richardson also quoted our opinion in *North, supra*, 8 Cal.3d at page 309: " ' "A man detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in free society. His lack of privacy is a necessary adjunct to his imprisonment . . . ." ' " (*De Lancie*, at p. 881 (dis. opn. of Richardson, J.).)

The Court of Appeal held the tape recording did not violate the Fourth, Fifth or Sixth Amendment to the United States Constitution, and thus suppression was not an available remedy. The court thus stated that defendant's "only coherent theory of error is that the prosecutor's misconduct was such an egregious violation of her rights as to 'shock the conscience' and effect a denial of due process under the federal Constitution." The opinion cited Proposition 8 (Cal. Const., art. I, § 28, subd. (d)), "which prohibits the suppression of evidence except where it is compelled by federal authority."[3] Finding no federal constitutional violation, and thus no basis for remedy, whether suppression, dismissal or recusal, the Court of Appeal noted that the unresolved *De Lancie* issues "may deserve the attention of the Supreme Court, especially in light of recent statutory amendments [to section 2601]."

Justice Poché dissented, disagreeing with the majority's conclusion that there was no available remedy. The dissent construed the taping as a denial of defendant's right to due process of law, warranting reversal and retrial. Justice Poché also found that the telephone taping violated federal wiretap law.

We granted review on the limited question of whether the trial court erred in not dismissing the information or recusing the prosecutor for the asserted *De Lancie* violation.

## II.  DISCUSSION

■  Defendant contends the surreptitious tape recording of conversations between her and her visitors violated *De Lancie* and warranted a

---

[3]The court refused to find that the federal Omnibus Crime Control and Safe Streets Act of 1968 compelled suppression.

remedy—either dismissal, recusal or suppression. Our analysis of the issue persuades us that the amendments noted by the Court of Appeal have abrogated the statutory basis for *De Lancie*. Indeed, the Legislature has acted to restore the pre-*De Lancie* state of the law. Accordingly, we find the taping of the conversations between defendant and her visitors did not violate California law.

A.   *The Legacy of Lanza: Jail Inmates Do Not Enjoy a Justifiable Expectation of Privacy*

The United States Supreme Court addressed this issue 40 years ago in *Lanza v. New York* (1962) 370 U.S. 139 [82 S.Ct. 1218, 8 L.Ed.2d 384] (*Lanza*). Jail officials secretly tape-recorded a conversation between Lanza and his brother, an inmate, without their knowledge. (*Id.* at p. 141 [82 S.Ct. at pp. 1219-1220].) The court rejected Lanza's contention that the tape was the product of a Fourth Amendment violation. It distinguished the jail from those other settings that could implicate the right to be free from unreasonable search and seizure. "[T]o say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument . . . . [W]ithout attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." (*Lanza*, at p. 143 [82 S.Ct. at pp. 1220, 1221], fns. omitted.)

The *Lanza* doctrine shaped Congress's creation of the Omnibus Crime Control and Safe Streets Act of 1968. Title 18 United States Code section 2510(2), part of the wiretap law, defines a protected oral communication as one "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." The legislative history indicates that although Congress did not intend that the place of the communication determine the justifiability of the expectation, "[n]evertheless, such an expectation would clearly be unjustified in certain areas; for example, a jail cell (*Lanza v. New York*, 82 S.Ct. 1218, 370 U.S. 139 (1962)). . . ." (Sen.Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted at 1968 U.S. Code Cong. & Admin. News, p. 2178.)

We embraced the principle that a suspect's custodial conversations did not enjoy a justifiable expectation of privacy. Although we protected a defendant's right to privacy regarding his communications with counsel (*In re Jordan* (1972) 7 Cal.3d 930, 937-938, fn. 3 [103 Cal.Rptr. 849, 500 P.2d

873]; *People v. Lopez* (1963) 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16]) or where jail officers acted so that the suspect "and his wife were lulled into believing that their conversation would be confidential" (*North, supra,* 8 Cal.3d at p. 311), we affirmed the general rule that "[a]bsent such unusual circumstances, [inmates and their visitors] can have no reasonable expectation that their jailhouse conversations will be private." (*People v. Hill* (1974) 12 Cal.3d 731, 765 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872].) Accordingly, prior to *De Lancie,* the Courts of Appeal uniformly rejected defense claims of privacy for custodial conversations, regardless of whether the claim was based on the federal Constitution (U.S. Const., 4th Amend.; see, e.g., *People v. Finchum* (1973) 33 Cal.App.3d 787 [109 Cal.Rptr. 319]; *In re Joseph A.* (1973) 30 Cal.App.3d 880 [106 Cal.Rptr. 729]), the state Constitution (Cal. Const., art. I, §§ 1, 13; see, e.g., *People v. Dominguez* (1981) 121 Cal.App.3d 481, 505 [175 Cal.Rptr. 445]; *People v. Owens* (1980) 112 Cal.App.3d 441, 449 [169 Cal.Rptr. 359] (*Owens*); *People v. Estrada* (1979) 93 Cal.App.3d 76, 98 [155 Cal.Rptr. 731] (*Estrada*)), federal statutory law (18 U.S.C. § 2510(2)) or state statutory law (Pen. Code, § 632). (*Estrada,* at pp. 98-99.)

B.   *The Lawfulness of Inmate Monitoring and Recording Prior to De Lancie*

Prior to our 1982 *De Lancie* opinion, inmate monitoring and recording such as occurred below was lawful in California and the rest of the country. In addition to rejecting the claims that monitoring violated an inmate's justifiable expectation of privacy, California courts also rejected former section 2600 as a basis for insulating custodial conversations from oversight. We described the import of that statute: "In this state we have long since abandoned the medieval concept of strict 'civil death' and have replaced it with statutory provisions seeking to insure that the civil rights of those convicted of crime be limited *only in accordance with legitimate penal objectives.* The 1968 amendments . . . which resulted in the enactment of section 2600 in its present form, represent the most recent legislative effort in this direction." (*In re Harrell* (1970) 2 Cal.3d 675, 702 [87 Cal.Rptr. 504, 470 P.2d 640] (*Harrell*), italics added.)

The *Harrell* standard allowed the secret recording of custodial conversations. In *Estrada, supra,* 93 Cal.App.3d 76, the defendant's sister, and, on another occasion, his brother-in-law, visited him in jail. Jail officials monitored and taped the conversations. (*Id.* at pp. 86, 98.) The Court of Appeal found this surveillance complied with *Harrell.* (*Estrada,* at pp. 99-100.)

"While the deprivation of a prisoner's rights or privileges requires penological objectives, the legitimacy of jailhouse monitoring of inmate conversations is based on precisely these objectives, and is in no way *restricted* to the maintenance of institutional security. Even assuming that in this case the security of the institution was not the interest of the officials in monitoring the instant conversations, a wide range of concerns remain to justify the imposition of certain restrictions upon the rights of prisoners." (*Ibid.*)

Most apposite to the instant case is *Owens, supra,* 112 Cal.App.3d 441. Police arrested Owens and another suspect, who offered conflicting statements. They were placed together in an interview room where they made inculpatory statements that were secretly recorded. (*Id.* at p. 444.) The Court of Appeal affirmed the validity not only of the taping but also of what we later characterized as the "public interest in detecting a suspect's fabrication." (*Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 33, fn. 6 [196 Cal.Rptr. 704, 672 P.2d 110] (*Donaldson*) (plur. opn. of Broussard, J.).) "The monitoring system . . . . was used to overhear a discussion between two recently arrested felony suspects who had just made factually divergent statements in separate interviews. Thus, in addition to the compelling interest in maintaining jail security we must consider the public interest in acting on a well-founded suspicion that the detainees would take the opportunity to get their stories straight and that their conversation would touch on criminal activity." (*Owens,* at p. 449.)

Therefore, prior to *De Lancie,* the prevailing law recognized as legitimate the "interest in ferreting out and solving crimes." (*People v. Seaton* (1983) 146 Cal.App.3d 67, 81, fn. 11 [194 Cal.Rptr. 33], citing *Owens, supra,* 112 Cal.App.3d at pp. 449-450.) We thus observed that "[p]rior to *De Lancie,* the fact that a particular conversation was monitored not for security purposes but to gather evidence did not argue against admissibility." (*Donaldson, supra,* 35 Cal.3d at p. 33, fn. omitted.) This principle conformed to federal law, which also found this motive legally insignificant. The Ninth Circuit Court of Appeals approved taping in a case where police placed two codefendants in a room "in the hope that the two would discuss the crime and make some incriminating admissions." (*Williams v. Nelson* (9th Cir. 1972) 457 F.2d 376, 377 (*Nelson*).)[4] Had the taping in this case occurred prior to *De Lancie,* there would have been no valid basis for objection.

---

[4]*Nelson* adopted an even more deferential position toward jailhouse taping than *Owens,* inasmuch as the room in which the *Nelson* defendants were placed was "apparently private" (*Nelson, supra,* 457 F.2d at p. 377) which, under California law, could have been grounds for invalidating the taping. (See *North, supra,* 8 Cal.3d at p. 311.)

## C. *Procunier and the Demise of Harrell*

The *Harrell* standard had a limited lifespan, thanks to prodding from the United States Supreme Court. Although the Court of Appeal, citing *Harrell*, had allowed the censoring of inmate mail to parties other than counsel (*Yarish v. Nelson* (1972) 27 Cal.App.3d 893, 898 [104 Cal.Rptr. 205]), the high court restricted this practice in *Procunier v. Martinez* (1974) 416 U.S. 396 [94 S.Ct. 1800, 40 L.Ed.2d 224] (*Procunier*)),[5] which found former section 2600 inadequate to protect the constitutional rights at stake. (*Procunier*, at pp. 403-404 [94 S.Ct. at pp. 1806-1807].) The *Procunier* court, considering the First Amendment rights involved, barred censorship of mail for the purpose of suppressing criticism of prison authorities. Instead, the court required that prison officials "must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." (*Procunier*, at p. 413 [94 S.Ct. at p. 1811].) Thus, prison regulations involving mail had to be "generally necessary" to protect security, order or rehabilitation. (*Id.* at p. 414 [94 S.Ct. at pp. 1811-1812].)[6] Notably, the decision rested not on the free speech rights of the inmate (the court declined to decide the extent to which these rights survived incarceration) but on the rights of those relatives and friends outside the prison who wished to correspond with the inmate. (*Procunier*, at pp. 408-409 [94 S.Ct. at pp. 1808-1809].)

The *Procunier* court also addressed the state rule that limited defense investigators' access to the prisoner-clients whom they served. This restriction inhibited prisoners' access to the courts. The rule did not flatly infringe on a federal constitutional right (like the mail rule), however, and the standard for evaluating the rule was more deferential. "[P]rison administrators are not required to adopt every proposal that may be thought to facilitate prisoner access to the courts. The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration . . . ." (*Procunier*, *supra*, 416 U.S. at

---

[5]As we indicate in part II.E. (*post*, at p. 1008), the United States Supreme Court narrowed *Procunier* in *Turner v. Safely* (1987) 482 U.S. 78 [107 S.Ct. 2254, 96 L.Ed.2d 64] (*Turner*) and formally overruled it in *Thornburgh v. Abbott* (1989) 490 U.S. 401 [109 S.Ct. 1874, 104 L.Ed.2d 459].

[6]Significantly, the high court barred censorship of inmate correspondence, not monitoring: "[F]reedom from censorship is not equivalent to freedom from inspection or perusal." (*Wolff v. McDonnell* (1974) 418 U.S. 539, 576 [94 S.Ct. 2963, 2984, 41 L.Ed.2d 935].) Monitoring of inmate correspondence is now expressly authorized under 28 Code of Federal Regulations part 540.14(c)(2) (2002). (See *Altizer v. Deeds* (4th Cir. 1999) 191 F.3d 540, 549, fn. 15.)

p. 420 [94 S.Ct. at pp. 1814-1815].) *Procunier* thus required a strict scrutiny standard for the infringement of rights protected by the United States Constitution, but affirmed the *Harrell* standard to protect other prisoner interests.

After *Procunier*, the state Legislature amended section 2600 to provide that "A person sentenced to imprisonment . . . may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." (Stats. 1975, ch. 1175, § 3, p. 2897.) The Legislature answered the question expressly reserved by *Procunier*, namely to what extent the rights of *inmates* could be infringed. The amendment generally followed the *Procunier* standard except in two respects: (1) the statute omitted rehabilitation from the list of permitted goals;[7] and (2) the statute provided for the same strict scrutiny regardless of whether the right was protected by the United States Constitution. Additionally, the Legislature added section 2601, which, in former subdivision (d), granted prisoners the right to have personal visits, subject to reasonable security restrictions.[8] (Stats. 1975, ch. 1175, § 3, pp. 2897-2898.) These statutory amendments formed the basis for *De Lancie*'s invalidation of the formerly lawful practice of monitoring and recording custodial conversations.

### D. *De Lancie*

*De Lancie* was the result of a suit for declaratory and injunctive relief from the practice of monitoring and recording inmates'[9] conversations for the purpose of gathering evidence for use in prosecutions. (*De Lancie, supra,* 31 Cal.3d at p. 867.)[10] The *De Lancie* court recalled the *Harrell* standard, under which inmate rights could " 'be limited only in accordance with

---

[7]Additionally, whereas *Procunier* recognized the propriety of curtailing speech to protect "order" (*Procunier, supra,* 416 U.S. at p. 413 [94 S.Ct. at p. 1811], overruled on other grounds by *Thornburgh v. Abbott, supra,* 490 U.S. 401), the statute focused on "the reasonable protection of the public" (former § 2600, as amended by Stats. 1975, ch. 1175, § 3, p. 2897). These two interests may be similar.

[8]The former statute did not insulate these visits from monitoring, in contrast to section 2600, subdivision (b), which, since 1975, has protected the right "[t]o correspond, confidentially, with any member of the State Bar or holder of public office."

[9]The *De Lancie* suit concerned pretrial county jail detainees rather than convicted prisoners in state institutions. We reasoned, however, that pretrial detainees deserved "rights at least equivalent" to those enjoyed by convicted felons. (*De Lancie, supra,* 31 Cal.3d at p. 872.)

[10]Because the respondent sheriff filed a demurrer, we had no opportunity to determine the factual question of whether and to what extent the monitoring and taping was for security or investigative purposes. (*De Lancie, supra,* 31 Cal.3d at p. 868.)

legitimate penal objectives,' " (*De Lancie*, at p. 871, quoting *Harrell, supra*, 2 Cal.3d at p. 702) but found that standard was superseded by the 1975 amendment to section 2600. We quoted the amended provision, italicizing the words " '*necessary in order to provide for the reasonable security of the institution*' " to emphasize the shift in the law away from the former standard. (*De Lancie*, at p. 870.)[11] The *De Lancie* majority observed the recordings violated this standard if, as the complaint alleged, they "are intended not to enhance or preserve prison security, but rather to obtain evidence for use by investigatory and prosecuting agencies in search of convictions." (*Id.* at p. 873.)

Although the plaintiffs had alleged violations of the federal and California Constitutions, as well as the federal wiretap law (18 U.S.C. §§ 2510-2520), we based our ruling solely on a ground omitted from the complaint: sections 2600 and 2601. "[T]he provisions of Penal Code sections 2600 and 2601 are dispositive of the issues presented [here]." (*De Lancie, supra*, 31 Cal.3d at p. 870.) Nothing in the decision otherwise altered the traditional understanding that inmates do not enjoy a justifiable expectation of privacy in their custodial conversations. On the contrary, as Justice Mosk's dissent observed, "The concept of one purporting to enjoy privacy while he is under legally authorized supervision would appear to be a monumental anomaly." (*De Lancie, supra*, 31 Cal.3d 865, 882 (dis. opn. of Mosk, J.).)[12]

We thus decided in *De Lancie* that the 1975 statutory amendments "established a policy that prisoners retain the rights of free persons, including the right of privacy, except to the extent that restrictions are necessary to insure

---

[11]The court thus rejected dictum in *North, supra*, 8 Cal.3d at page 312, approving comparable recording, because *North* predated the 1975 section 2600 amendment. (*De Lancie, supra*, 31 Cal.3d at p. 874.)

[12]*De Lancie* expressly declined to consider a constitutional basis for its holding (*De Lancie, supra*, 31 Cal.3d at p. 877, fn. 13). We have usually, but not uniformly, recalled the holding's limited basis. (Compare *People v. Champion* (1995) 9 Cal.4th 879, 912 [39 Cal.Rptr.2d 547, 891 P.2d 93] [*De Lancie* "held that sections 2600 and 2601 prohibit police from monitoring"]; *People v. Gallego* (1990) 52 Cal.3d 115, 169 [276 Cal.Rptr. 679, 802 P.2d 169] ["[r]elying on statutory grounds, we held . . . the police may not monitor"]; *People v. Carrera* (1989) 49 Cal.3d 291, 326 [261 Cal.Rptr. 348, 777 P.2d 121] [describing *De Lancie* as "holding that the monitoring . . . was barred by sections 2600 and 2601"]; *People v. Phillips* (1985) 41 Cal.3d 29, 79 [222 Cal.Rptr. 127, 711 P.2d 423] [*De Lancie* "expressly declined to base our decision on federal or state constitutional grounds, finding it sufficient to rest it on section 2600 . . . and section 2601"]; *People v. Crowson* (1983) 33 Cal.3d 623, 630 [190 Cal.Rptr. 165, 660 P.2d 389] (plur. opn. of Kaus., J.) ["In *De Lancie* we held that sections 2600 and 2601 accord . . . a statutory right to privacy"]; with *People v. Edelbacher* (1989) 47 Cal.3d 983, 1004 [254 Cal.Rptr. 586, 766 P.2d 1] [court gave "full recognition of both the statutory and constitutional bases of [*De Lancie*]"]); *Donaldson, supra*, 35 Cal.3d at p. 37 (plur. opn. of Broussard, J.) ["*De Lancie* was clearly not a simple application of the statutory language"]; *id.* at p. 41, fn. 1 (dis. opn. of Reynoso, J.) [issue implicates "constitutional right of privacy"].)

the security of the prison and the protection of the public." (*De Lancie*, *supra*, 31 Cal.3d at p. 868.)[13] We have also recognized that the decision shifted the law: "[U]nder settled federal precedent and under the California decisions prior to *De Lancie* . . . the secret monitoring and recording of unprivileged conversations in prisons, jails, and police stations did not constitute an unlawful search." (*Donaldson, supra*, 35 Cal.3d at p. 27.)

### E.   *Restoring Harrell*

Just as the establishment of *Procunier*'s strict standard led to the abolition of the *Harrell* standard, the abandonment of *Procunier* led to *Harrell*'s restoration. In *Turner, supra*, 482 U.S. 78, the United States Supreme Court formally determined the question reserved in *Procunier* by concluding that case protected the First Amendment rights of only the civilians with whom the inmates were corresponding. The rights of prisoners enjoyed less stringent protection; "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." (*Turner*, at p. 89 [107 S.Ct. at p. 2261].) The state Legislature adopted this standard in its 1994 amendment to section 2600, which now reads, "A person sentenced to imprisonment in a state prison may . . . be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests."

The amendment reflected the Legislature's desire to repeal the expansive protections afforded California inmates and replace them with the more limited protections available under federal law as described in *Turner, supra*, 482 U.S. 78. In *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 130 [105 Cal.Rptr.2d 46, 18 P.3d 1198], we observed the 1994 amendment abrogated the standard we had followed in *In re Arias* (1986) 42 Cal.3d 667 [230 Cal.Rptr. 505, 725 P.2d 664]. *Thompson* recognized prison restrictions on inmate liberties that might have been invalid prior to 1994 could now be valid. (*Thompson*, at pp. 129-130 [restriction on practice of religion that might have been invalid under pre-1994 standard was valid under new law].) We hold the monitoring of inmates' conversations with visitors to be another such regulation that has become valid after the 1994 amendment.

---

[13]Even if prisoners enjoyed the same degree of legal protection as free persons, it is not evident that the surveillance was unlawful. In *People v. Kaaienapua* (1977) 70 Cal.App.3d 283 [138 Cal.Rptr. 651], the Court of Appeal found there was no privacy violation where police, suspecting unlawful activity in a boardinghouse room, entered, with the building manager's permission, the vacant room adjacent to the suspected crime site and overheard incriminating evidence. "We do not believe . . . the California . . . right to privacy . . . give[s] to criminals any greater right to privacy than that enjoyed by ordinary citizens who daily assume the risk that their neighbors may listen to their conversations through a common wall." (*Id.* at p. 288.)

Construing the "legitimate penal objectives" in *Harrell, supra,* 2 Cal.3d at page 702, and "legitimate penological interests" in the current section 2600 and finding them comparable phrases, we conclude the current standard is less restrictive than the *Harrell* test. Our former standard permitted restrictions on inmates' activities "only in accordance" (*Harrell,* at p. 702) with the proper goals, whereas the current standard permits such restrictions whenever they are "reasonably related" to the goals (*Turner, supra,* 482 U.S. at p. 89 [107 S.Ct. at p. 2261]). We therefore conclude the Legislature, in restoring the legitimate penological objectives/interests standard of *Harrell,* intended to restore the former law regarding inmates' rights. ▮▮▮▮ Any restrictions on inmates' rights that were lawful prior to *De Lancie,* a fortiori, will be lawful under the current test.[14] Because the current standard was operative during the surveillance challenged below, and such surveillance was lawful prior to *De Lancie,* we find it was lawful in this case, and therefore not misconduct.[15]

▮▮▮ Although we base our decision on our own precedent, our conclusion draws support from other jurisdictions. We note other jurisdictions permit the monitoring and recording of custodial conversations, without expressly requiring a noninvestigative purpose. (See, e.g., *Angel v. Williams* (8th Cir. 1993) 12 F.3d 786, 790; *U.S. v. Willoughby* (2d Cir. 1988) 860 F.2d 15, 22; *United States v. Harrelson* (5th Cir. 1985) 754 F.2d 1153, 1168-1171; *Allen v. State* (Fla. 1994) 636 So.2d 494, 496-497; *State v. Wilkins* (1994) 125 Idaho 215 [868 P.2d 1231, 1237-1238]; *State v. Strohl* (1999) 255 Neb. 918 [587 N.W.2d 675, 682]; *Belmer v. Commonwealth* (2001) 36 Va.App. 448 [553 S.E.2d 123, 129].) The result is the same even where the express purpose is to gather evidence to support the prosecution. (*Nelson, supra,* 457 F.2d at p. 377; *State v. Ryan* (1976) 145 N.J.Super. 330 [367 A.2d 920, 922.)[16]

---

[14]Our decision today allows police officers to monitor conversations in jail as they may monitor conversations in police cars, in accordance with *People v. Crowson* (1983) 33 Cal.3d 623 [190 Cal.Rptr. 165, 660 P.2d 389]. There is no longer a distinction between the two locations regarding an individual's reasonable expectations of privacy in her communications. (See *People v. Califano* (1970) 5 Cal.App.3d 476, 481-482 [85 Cal.Rptr. 292]; *People v. Chandler* (1968) 262 Cal.App.2d 350, 356 [68 Cal.Rptr. 645].)

[15]In 1996, the Legislature further distanced statutory law from *De Lancie* by repealing the section 2601, subdivision (d) right to visits. (Stats. 1996, ch. 132, § 1.) The Legislature has thus completely "delete[d] the language quoted" in *De Lancie*. (4 Witkin & Epstein, Cal. Criminal Law (3d. ed. 2000) Illegally Obtained Evidence, § 352, p. 1037.)

[16]Defendant cites the inapposite case of *United States v. Cohen* (2d Cir. 1986) 796 F.2d 20], where the Second Circuit Court of Appeals suppressed documents discovered during a search of the defendant's cell conducted to gather evidence. Because *Cohen* was decided before *Turner, supra,* 482 U.S. 78, the Second Circuit followed the "rule that when a prison restriction infringes upon a specific constitutional guarantee, it should be evaluated in light of institutional security." (*Cohen,* at p. 22.) It is far from certain that the Second Circuit Court of

CONCLUSION

We therefore conclude that *De Lancie, supra*, 31 Cal.3d 865, no longer correctly states California law regarding inmate rights. Following the 1994 amendment to section 2600, California law now permits law enforcement officers to monitor and record unprivileged communications between inmates and their visitors to gather evidence of crime. Accordingly, we affirm the judgment of the Court of Appeal.

George, C. J., Baxter, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.**—I concur in the majority's result, but would analyze the matter differently.

Our decision in *De Lancie v. Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142], held that surreptitious recording of conversations between an inmate in jail awaiting trial and his visitors, unless justified by security concerns, violated the inmate's right of privacy. *De Lancie* was based on Penal Code section 2600, which from 1975 until 1995 provided: "A person sentenced to imprisonment . . . may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." (Stats. 1975, ch. 1175, § 3, p. 2897.) *De Lancie* held that pretrial detainees enjoyed at least the same rights as convicted inmates, and observed that recording conversations between inmates and visitors would violate section 2600 if the recordings were "undertaken for the purpose of gathering evidence for use in criminal proceedings, rather than to maintain the security of the jail." (*De Lancie,* at p. 877.)

The 1994 Legislature, however, amended section 2600 to provide as it does today: "A person sentenced to imprisonment in a state prison may . . .

Appeals would have reached the same result after *Turner* announced its more deferential test. In any event, because the evidence seized was paperwork located in the inmate's cell, rather than statements made during conversations with visitors, it is factually distinguishable.

Similarly inapposite is defendant's reference to *Ferguson v. Charleston* (2001) 532 U.S. 67 [121 S.Ct. 1281, 149 L.Ed.2d 205], for the proposition that the instant investigative purpose rendered the monitoring unlawful. The *Ferguson* court invalidated hospital personnel's searching and seizing patients' urine to analyze for evidence of criminal activity. The court found the search and seizure served only general law enforcement purposes, and not "special needs," which would justify dispensing with traditional Fourth Amendment protections. (*Id.* at p. 77 [121 S.Ct. at p. 1288].) By contrast, the instant monitoring implicates no Fourth Amendment protections. The interest of public safety is so compelling that it may be relevant when determining the scope of constitutional protections (see, e.g., *New York v. Quarles* (1984) 467 U.S. 649 [104 S.Ct. 2626, 81 L.Ed.2d 550]), but this hardly means police must show a public safety purpose to investigate crime where no constitutional prohibition exists.

be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests." In *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 130 [105 Cal.Rptr.2d 46, 18 P.3d 1198], we concluded that this amendment adopted the view of the United States Supreme Court in *Turner v. Safely* (1987) 482 U.S. 78 [107 S.Ct. 2254, 96 L.Ed.2d 64], under which the monitoring of inmate conversations with visitors to gather evidence against the inmate is justified as reasonably related to a legitimate penological goal. As interpreted in *Thompson,* the 1994 amendment effectively abrogated this court's holding in *De Lancie.*

Consequently, there is no need for the majority to discuss pre-*De Lancie* California decisions, to determine whether or not *De Lancie* was correctly decided in the first place, or to consider whether the 1994 Legislature intended not only to adopt the standard of *Turner v. Safely, supra,* 482 U.S. 78, but also to resurrect *In re Harrell* (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504, 470 P.2d 640]. The majority's sweeping assertion that "[a]ny restrictions on inmates' rights that were lawful prior to *De Lancie . . .* will be lawful under the current test" (maj. opn., *ante,* at p. 1009) remains to be tested when the courts examine specific restrictions.

Law enforcement authorities in California are required to comply with state restrictions on the gathering of evidence, even when those restrictions cannot be enforced by excluding that evidence from admission. Thus, the prosecution here took a considerable risk in instituting a surveillance practice this court had condemned in *De Lancie* at a time when no court decisions had construed the 1994 amendment to Penal Code section 2600. But because the majority concludes that the 1994 amendment does support the prosecution's action and effectively abrogated the holding in *De Lancie,* it correctly affirms the Court of Appeal decision rejecting the imposition of sanctions on the prosecution.

**WERDEGAR, J.,** Concurring.—I agree with the majority that the monitoring and recording of defendant's personal visits did not violate California law, despite our decision in *De Lancie v. Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142] (*De Lancie*). In my view, however, this is true *not* because the holding of *De Lancie* has been abrogated by intervening amendments to Penal Code section 2600,[1] but because *De Lancie* was erroneously decided.

In *De Lancie,* this court assumed that an incarcerated person had a reasonable expectation of privacy in his or her conversations, creating a privacy right upon which jail officials could, under section 2600, infringe

---

[1]All further statutory references are to the Penal Code.

only as necessary for institutional security. (*De Lancie, supra,* 31 Cal.3d at pp. 873-876.) Our error, as the dissenting justices explained, was in assuming that either the common law or constitutional right to conversational privacy persisted when a person entered prison or jail and became subject to the pervasive official surveillance that traditionally characterizes those environments. (See *id.* at p. 881 (dis. opn. of Richardson, J.) [" ' "A man detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in free society. His lack of privacy is a necessary adjunct to his imprisonment" ' "]; *id.* at p. 882 (dis. opn. of Mosk, J.) ["The concept of one purporting to enjoy privacy while he is under legally authorized supervision would appear to be a monumental anomaly"].)

Though the court's opinion in *De Lancie* displays some confusion on this point, that the versions of sections 2600 and 2601 then in force did not *confer* on prisoners a right of conversational privacy is clear; at most the statutes limited the extent to which jail officials could curtail an otherwise existing right. Section 2600 simply provided that prisoners could be "deprived of such rights, and only such rights," as was necessary for institutional security. (*De Lancie, supra,* 31 Cal.3d at p. 870.) Of course, no deprivation can occur if no right exists. Section 2601 guaranteed certain enumerated rights, including personal visits, but these did *not* include the right to conduct such visits, or other jailhouse conversations, in privacy. (*De Lancie,* at p. 870.)

As sections 2600 and 2601 did not themselves confer a right of privacy in jailhouse conversations, and as the court did not cite any other statutory basis, the right of privacy the *De Lancie* majority recognized could only have derived from the common law, the California Constitution's privacy guarantee (art. I, § 1), or the constitutional prohibitions against unreasonable searches (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13). But all these sources require as a predicate to establishing an invasion of privacy or unreasonable search that the person had an objectively reasonable expectation of privacy in the invaded place, conversation or data source. (See *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 232 [74 Cal.Rptr.2d 843, 955 P.2d 469]; *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 36-37 [26 Cal.Rptr.2d 834, 865 P.2d 633]; *Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 28-30 [196 Cal.Rptr. 704, 672 P.2d 110].) Courts have generally found no reasonable expectation of privacy in jailhouse conversations for purposes of search and seizure law (see *Donaldson v. Superior Court,* at pp. 30-34; *U.S. v. Peoples* (8th Cir. 2001) 250 F.3d 630, 636-637), and this court itself had, prior to *De Lancie,* recognized the general rule that "an inmate of a jail or prison has no reasonable expectation of privacy" in conversations while incarcerated (*North v. Superior Court*

(1972) 8 Cal.3d 301, 311 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]).

Nevertheless, the *De Lancie* majority rejected the rule stated in *North v. Superior Court, supra,* and other cases, because in its view "[t]o deny a right of privacy on the ground that inmates, disabused by prior decisions, have lost their normal expectation of privacy would defeat the purposes of the statutes." (*De Lancie, supra,* 31 Cal.3d at p. 876.) This reasoning simply begged the question. The effect of prior decisions on prisoners' *subjective* expectations aside, no *objectively* reasonable expectation of conversational privacy can be maintained in prison or jail because of the pervasive and constant monitoring to which incarcerated persons are subject. The *De Lancie* majority, unlike the dissenters, closed its eyes to that fundamental fact. In so doing, it erred.

For these reasons, I concur in the judgment.

**MORENO, J.,** Concurring.—I agree with the majority that our decision in *De Lancie v. Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142] (*De Lancie*) was superseded by the 1994 amendment to Penal Code section 2600 such that, subject to Penal Code section 636,[1] "California law now permits law enforcement officers to monitor and record unprivileged communications between inmates and their visitors to gather evidence of crime." (Maj. opn., *ante,* at p. 1010.) In this case, however, the Alameda County prosecutor, without a warrant, asked the Santa Rita jail authorities to monitor and record defendant's in-house jail conversations *and* her outbound telephone calls. I write separately to underscore that *federal* law, specifically, title III of federal Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520) (the Act), still restricts the warrantless monitoring[2] of an inmate's outbound telephone calls.

I

In *People v. Otto* (1992) 2 Cal.4th 1088 [9 Cal.Rptr.2d 596, 831 P.2d 1178], we recognized that the Act governs wiretapping violations in California. We stated: " 'The purpose of the [Act] . . . was effectively to prohibit . . . *all* interceptions of oral and wire communications, *except those specifically provided for in the Act . . . .*' " (*Otto, supra,* at p. 1100, quoting *United States v. Giordano* (1974) 416 U.S. 505, 514 [94 S.Ct. 1820, 1826, 40

---

[1]Penal Code section 636, subdivision (a), makes it a felony to eavesdrop on, or secretly record, a detainee's or prisoner's conversation with his or her "attorney, religious adviser, or licensed physician."

[2]Where authorities have the right to monitor, they also have the right to record. (See, e.g., *People v. Murphy* (1972) 8 Cal.3d 349, 360 [105 Cal.Rptr. 138, 503 P.2d 594].)

L.Ed.2d 341].) The Act defines a " 'wire communication' " as "any aural transfer . . . by the aid of wire, cable, or other like connection between the point of origin and the point of reception . . . furnished or operated by a [common carrier] . . . ." (18 U.S.C. § 2510(1).) As common carriers operate outbound telephones, calls over such telephones are "wire communications." Internal jail phones, on the other hand, are not part of any public telephone system and are not furnished by a common carrier. As such, they are not covered by the Act. (See, e.g., *People v. Santos* (1972) 26 Cal.App.3d 397, 401-402 [102 Cal.Rptr. 678].)

The Act requires that a judicially authorized warrant be obtained before wiretapping can take place. (18 U.S.C. § 2518.) There are two exceptions to the warrant requirement: (1) where the interception is "by an investigative or law enforcement officer in the ordinary course of his duties" (18 U.S.C. § 2510(5)(a)(ii)); or (2) where "a person acting under color of law" wiretaps, and one party to the communication has given prior consent. (18 U.S.C. § 2511(2)(c).) Where the Act is violated, the remedy is suppression of the intercepted communication. (18 U.S.C. § 2515.)

In the seminal case of *United States v. Paul* (6th Cir. 1980) 614 F.2d 115 [61 A.L.R.Fed. 816] (*Paul*), the government took the broad view that the Act did not apply to the secret recording of outbound telephone calls originating from prison. (*Id.* at p. 116.) The *Paul* court rejected this argument and held that the Act did apply, but found that the prison wiretap was permissible under 18 United States Code section 2510(5)(a)(ii), the Act's "ordinary course of duties" exception, because (1) the monitoring was done pursuant to a policy statement issued by the Federal Bureau of Prisons; and (2) posted telephone rules gave the inmates "reasonable notice" that such monitoring might occur. (*Paul, supra*, at p. 117.)

In *U.S. v. Sababu* (7th Cir. 1989) 891 F.2d 1308, 1328-1329, the court found the ordinary course of duties exception applied where (1) the monitoring was conducted pursuant to an established prison policy; (2) monitoring notices were posted over each outbound telephone in English and Spanish; and (3) during orientation, the inmates were told that their outbound telephone conversations were subject to monitoring.

The federal courts have also found, under similar facts, that jailhouse wiretapping falls within 18 United States Code section 2511(2)(c) under an "implied consent" theory. For example, in *U.S. v. Amen* (2d Cir. 1987) 831 F.2d 373, 378-379, the court found "implied consent" where (1) the prisoner attended a lecture that outlined the prison's monitoring policy; (2) he received a copy of a handbook that stated that outbound telephone calls

would be monitored; and (3) monitoring notices, in English and Spanish, were placed on each outbound telephone.

In *U.S. v. Van Poyck* (9th Cir. 1997) 77 F.3d 285, 291-292, the court found "implied consent" where (1) the defendant signed a form that warned him of the prison's monitoring and taping policy; (2) he was given a prison manual explaining possible recording; and (3) monitoring notices were posted by the outbound telephones.

It thus appears that the warrantless monitoring of an inmate's outbound telephone calls is prohibited by the Act, unless the inmate is given meaningful notice, such as by a signed acknowledgement form, a monitoring notice posted by the outbound telephone, or a recorded warning that is heard by the inmate through the telephone receiver, prior to his or her making the outbound telephone call.

## II

In the case at bar, from March 26, 1996 through June 30, 1996, the Alameda County prosecutor requested that jail officials at the Santa Rita jail secretly record all of defendant's outbound phone calls to her friend, Ann Argabrite, and her brother, Philip Loyd. The prosecutor also requested that all of defendant's in-house nonattorney jail conversations be recorded. The prosecutor made these requests without the benefit of a warrant. There were no warning signs in the outbound telephone area indicating that calls might be recorded. While the outbound phone system was configured to play a taped warning, the system was malfunctioning in March and April of 1996 and became operative sometime in June of 1996. It was established in the trial court that, upon arrival, each inmate was given a copy of jail rules and regulations, but it was unknown whether Loyd actually received a pamphlet that contained a warning about the monitoring policy. However, the pamphlet typically contained such a warning. Finally, jail officials operated the telephone monitoring system according to an established monitoring policy.

The Act was given short shrift at the trial court level. As stated by the Court of Appeal, "defendant placed no emphasis on it and never specifically informed the trial court that it might supply authorization to exclude the tapes." A review of the briefs before this court supports the Court of Appeal's statement. The trial court apparently made no factual findings as to specific dates that defendant's outbound calls were secretly recorded. Nor did the trial court determine if any particular recording was a product of an in-house jail conversation or an outbound telephone call. I therefore agree with the Court of Appeal that the Act was not properly raised.

## III

In *People v. Riel* (2000) 22 Cal.4th 1153 [96 Cal.Rptr.2d 1, 998 P.2d 969], we refused to exclude a secretly recorded in-house jail conversation, obtained in violation of *De Lancie*, under the truth-in-evidence provision (Cal. Const., art. I, § 28, subd. (d)), because " 'federal law [did] not bar its admission.' " (*Riel, supra,* at p. 1184, quoting *People v. Hines* (1997) 15 Cal.4th 997, 1043 [64 Cal.Rptr.2d 594, 938 P.2d 388].) A question left open in *Riel,* and resolved here, is whether a prosecutor's warrantless request for in-house jail monitoring constitutes prosecutorial misconduct. As noted, where this request is limited to the secret monitoring of internal jail phones, the request is appropriate. Where a prosecutor requests the monitoring of outbound telephone calls, however, any monitoring must comply with the provisions of the Act. Prosecutors who request such monitoring have, at a minimum, an ethical obligation to ensure that such monitoring is in compliance with the Act. The demise of *De Lancie* does not signal a death knell for the protections afforded under federal law.

Kennard, J., concurred.