[No. E054229. Fourth Dist., Div. Two. Feb. 6, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
ELVA DIAZ, Defendant and Appellant.

## Counsel

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and James D. Dutton, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HOLLENHORST, Acting P. J.—**

### I. INTRODUCTION

Defendant Elva Diaz appeals from her conviction of involuntary manslaughter (Pen. Code, § 192, subd. (b)),[1] as a lesser included offense to the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

charge of second degree murder in count 1, and vehicular manslaughter with gross negligence while intoxicated (§ 191.5, subd. (a)) in count 2. Defendant contends the admission of evidence obtained through the warrantless seizure of the sensing diagnostic module (SDM)[2] from her previously impounded vehicle and the downloading of data from the device violated her Fourth Amendment rights. We affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. *Prosecution Evidence*

About 8:00 p.m. on February 21, 2008, defendant drove herself and her then boyfriend, Zachary Palumbo, in her Chevrolet Tahoe truck to a bar a mile or two from their home. At the bar they drank and socialized. Palumbo had been a police officer for about nine years, and he was trained in identifying signs of intoxication. When they left the bar at 11:00 p.m. or 12:00 midnight, Palumbo believed he was less intoxicated than defendant, and he offered to drive home. An argument ensued, and defendant got into the driver's seat and insisted on driving. The argument lasted several minutes, and defendant's friend pulled up and offered Palumbo a ride. Defendant

---

[2] One legal commentary has described SDM's as follows:

"Every vehicle with air bags has an air bag control module that monitors a developing crash and, based on the information received, decides whether to deploy the air bags. In addition, the module runs a diagnostic examination to make sure that its system is operating properly. The module also has a function that records data and, after a crash, stores some of that data in the EDR, which is a component of the air bag control module. For General Motors Corporation vehicles, this module is known as a sensing diagnostic module (SDM) . . . . In addition to recording such matters as the warning lamp status (which, when lighted indicates problems) and whether the driver's belt is buckled, an EDR captures information about the severity of a crash, known as the delta force or the change of speed, and the duration of the crash. Moreover, the EDR records and stores four matters for a five-second period before a crash event—the vehicle speed, the engine revolutions per minute (RPM), the brake switch status (whether the brake has been applied), and the throttle position.

"The SDM, which is controlled by a microprocessor, has multiple functions: (1) it determines if a severe enough impact has occurred to warrant deployment of the air bag; (2) it monitors the air bag's components; and (3) it permanently records information. The SDM contains software that analyzes the longitudinal deceleration of a vehicle to determine whether a deployment event has occurred based on testing that was done previously to determine what events would require protection by an air bag. When the SDM senses an event (either a deployment event or an event that is not severe enough to require an air bag—that is, a near-deployment event), that information is recorded to the microprocessor's electrically erasable programmable read-only memory (EEPROM). When the air bag is deployed, the SDM records the event as a 'Code 51.' If the data from an EDR is properly evaluated, it can provide an impartial source of evidence for the reconstruction and biomechanics community to utilize." (Annot., Admissibility of Evidence Taken from Vehicular Event Data Recorders (EDR), Sensing Diagnostic Modules (SDM), or "Black Boxes" (2008) 40 A.L.R. 6th 595, 601, § 2, fns. omitted.)

stayed in her truck, and Palumbo chose to walk home. As he was walking, he saw defendant drive by; she seemed to be driving normally.

Defendant's friend, Caryn Keppler, testified that she had been at the bar with defendant that night. When Keppler left the bar around midnight, she saw defendant and Palumbo in the parking lot having an argument about who was going to drive. Defendant got into the car and "pretty much locked herself in." Keppler drove past them and asked Palumbo if he needed a ride, but he declined. Keppler did not remember if she had also offered defendant a ride.

Luis Aguilar had been driving home at 12:40 a.m. when he called 911 to report a traffic accident at the intersection of Claystone and Knabe in Corona. Defendant got out of her truck, which was upside down. She told Aguilar she was a paramedic and "she s[aw] this all the time," which Aguilar understood her to mean "those types of accidents." She was crying, and she told Aguilar the accident was not her fault and that the other driver was at fault. Aguilar noticed a moderate-to-strong odor of alcohol on her breath, and she was slurring her speech a little. On his way walking home, Palumbo passed the crash scene—defendant's truck was on its roof, and defendant was on the curb being interviewed by a California Highway Patrol (CHP) officer. Rachel Elliott, the 18-year-old driver of the other vehicle, a Honda Accord, suffered skull fractures in the collision and died from blunt force trauma.

CHP Officer Jack Penneau arrived at the accident scene at 12:40 a.m. Defendant told him she had been driving north on Knabe on the correct side of the road, and the other vehicle had been driving south in her lane, resulting in a head-on collision. Defendant said she had one beer at 8:00 p.m.; she denied being diabetic or epileptic. The officer testified that defendant did not perform properly on field sobriety tests, including nystagmus, standing position, and finger count. She smelled of alcohol and had bloodshot eyes and slurred speech. Preliminary alcohol screenings, at 1:14 a.m., 1:16 a.m., and 1:18 a.m., resulted in readings of 0.194, 0.154, and 0.160 percent blood alcohol respectively. Defendant was arrested and transported to the hospital, where her blood was drawn before she was taken to jail. Her blood-alcohol level at 2:58 a.m. was 0.20, and based on the absorption rate, would have been 0.23 at 12:30 a.m.

Defendant's truck and the victim's vehicle were impounded for evidence and towed to the towing company's secured lot. Officers determined the initial point of impact between the vehicles based on gouge or scrape marks on the pavement. The speed limit in that area was 50 miles per hour.

Stephen Turner, a member of the CHP's Multidisciplinary Accident Investigation Team (MAIT) supervised the inspection of defendant's Tahoe and

reviewed and approved the report of the inspection. Before conducting the inspection, the accident history and background of the vehicle were reviewed. The external condition of the vehicle was then documented; the control modules were downloaded; and the vehicle was taken apart. Turner inspected the Accord and determined that nothing about its mechanical condition would have caused or contributed to the crash. Turner also inspected the Tahoe, beginning with an external overview and an inspection of the control aspects of the vehicle, including the throttle, steering, suspension, brakes, tires, and wheels. Turner determined there were no mechanical deficiencies that would have contributed to the collision.

Sergeant Lance Berns, chief of the CHP's inland division MAIT, stated his opinion that the Tahoe had been travelling at 76 miles per hour at the point of impact. On cross-examination, Sergeant Berns conceded he could not estimate speed at the point of impact without the SDM data. The point of impact for the head-on collision was between the number one and number two lanes on northbound Knabe with the Tahoe traveling south. Defendant conceded she had crossed over the two sets of double yellow lines that separated the northbound and southbound lanes on Knabe.

Officer Richard Wong, also assigned to MAIT, testified that the main function of the SDM is to deploy the air bags. The SDM has the secondary function of recording throttle, speed, application of brakes, and transmission position. Data downloaded from the SDM showed that five seconds before the impact, the driver was not pushing on the gas pedal, and the Tahoe's speed was 84 miles per hour. Four seconds before the impact, the vehicle was traveling at 80 miles per hour with 7 percent pressure on the gas pedal. Three seconds before the impact, the vehicle was traveling at 77 miles per hour, with 31 percent pressure on the gas pedal. Two seconds before the impact, the vehicle was traveling at 77 miles per hour, with 84 percent pressure on the gas pedal. One second before the impact, the vehicle was traveling at 76 miles per hour, with 94 percent pressure on the gas pedal. The brake was not on from six to eight seconds before the impact. It was on at five seconds before the impact, and not on from four to one seconds before the impact. Officer Wong testified, based on his "training and experience with collision reconstruction," that "the photographs that [he] saw of the damage to both vehicles" was consistent with "the Tahoe traveling at 76 miles per hour."

Charges were not filed against defendant until 14 months after the accident. In May 2009, it was learned that defendant was in Mexico, and extradition proceedings were begun. Defendant was returned to the United States on July 27, 2010. She told the investigator she had hidden with her father because he did not want her to be in jail while he was alive. He had died on Easter, and she was going to come back and turn herself in after he died.

B. *Defense Evidence*

Dennis Burke, an investigator for the district attorney's office, testified he had interviewed Keppler in February 2009. Keppler told him she did not hear any conversation in the parking lot and did not observe any dispute at defendant's vehicle. Palumbo told Burke that Keppler had offered to give both him and defendant a ride home.

Defendant testified she had given her driver's license and keys to Palumbo at the bar, and she did not remember getting them back. At the bar, she drank multiple mixed drinks and shots of Tequila. She remembered having a hard time walking to the restroom but did not remember anything else at the bar. She did not remember going to the parking lot, having discussions at her truck, or driving away. She did not remember anyone trying to convince her not to drive. The next thing she remembered was sitting on a curb. She was extremely drunk that night. She admitted she had crossed two sets of double yellow lines, which is against the law.

Defendant was familiar with the road where the accident occurred, because she had driven it frequently in the year and a half when she lived nearby. She went to Mexico in June or July 2009 because she learned she had been charged with murder, and she was scared.

In her work as an emergency medical technician (EMT) and ambulance driver, she had seen the aftermaths of many traffic collisions, and sometimes the patients had an odor of alcohol, which could be from diabetic shock or alcohol impairment. She had been promoted to human resources, and in that capacity showed a video to others regarding the dangers of substance abuse and alcohol abuse in the workplace, and she had taken and administered a test on that subject. She denied that she knew any more than the average person about the dangers of driving under the influence. Specifically, in February 2008 she did not understand the dangerousness to human life of driving under the influence of alcohol, or the dangers to human life of driving at 84 miles per hour on Knabe and crossing over into oncoming traffic.

Three former fellow employees of defendant testified they did not believe EMT's had any special knowledge of the dangers of drunk driving. Nothing about their training increased their knowledge of that danger.

Palumbo told a defense investigator that defendant was "out of her mind" and unable to comprehend or listen to what he was saying that night. He said he had tried to convince defendant not to drive, but she was so intoxicated she was not listening to him and was unable to comprehend what he was saying.

## C. *Jury Verdict and Sentence*

The jury found defendant guilty of involuntary manslaughter (§ 192, subd. (b)) as a lesser included offense to the charge of murder in count 1, and guilty of vehicular manslaughter with gross negligence while intoxicated (§ 191.5, subd. (a)) in count 2.

The trial court sentenced defendant to the aggravated term of 10 years for count 2.[3]

## III. DISCUSSION

Defendant contends the warrantless search of her vehicle and the seizure of the vehicle's SDM violated the Fourth Amendment. The issue is one of first impression in this state.[4]

Preliminarily, we note that defendant concedes her Tahoe was "essentially totaled and was lawfully in police possession" when MAIT investigators downloaded data from the SDM. Moreover, she does not argue that impounding the vehicle on the night of the accident was improper or that there was no probable cause to obtain the SDM data. Rather, she argues no exigent circumstances existed, and she had a reasonable expectation of privacy in the SDM data. She argues that because the SDM was inaccessible and not in plain view, and its data were unavailable without connecting the SDM to a computer, there was a reasonable expectation that third parties would not have access even if she herself did not know of the presence of the SDM.

---

[3] Defendant represents that count 1 was later dismissed, although the dismissal is not reflected in the record.

[4] A New York court has addressed similar issues. In *People v. Christmann* (Just.Ct. 2004) 3 Misc.3d 309, 312 [776 N.Y.S.2d 437], an officer downloaded data from the SDM of the defendant's vehicle that had been involved in a fatal accident and used the data to determine the speed of the vehicle at impact. The defendant challenged the warrantless downloading of the data under the Fourth Amendment, but the court rejected the challenge. The court relied on *People v. Quackenbush* (1996) 88 N.Y.2d 534 [647 N.Y.S.2d 150, 670 N.E.2d 434], in which the police impounded a vehicle involved in a fatal pedestrian accident and conducted a safety inspection of the vehicle, including its brakes. The *Quackenbush* court upheld the seizure and search of the vehicle, reasoning that vehicles' safety equipment was subject to "extensive government regulation," including mandatory annual inspections, and a safety inspection after a fatal accident did not offend the Fourth Amendment because a diminished expectation of privacy in the mechanical areas of a vehicle must yield to the overwhelming state interest in investigating fatal accidents. (*Quackenbush, supra,* at pp. 537, 539.) The *Christmann* court held that the downloading of SDM data was a "reasonable extension" of the *Quackenbush* holding (*Christmann, supra,* at p. 314) and further held, "The downloading of the information is not analogous to a container search, nor does it extend to the private areas of the vehicle. There is also no opportunity for a police officer to select only the desired data or to manipulate it." (*Ibid.*)

## A. Standard of Review

On review of the trial court's denial of a motion to suppress evidence, this court accepts the trial court's express and implied factual findings when they are supported by substantial evidence, and we then independently assess whether, under the facts found, the search and seizure were reasonable under constitutional standards. (*People v. Alvarez* (1996) 14 Cal.4th 155, 182 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

## B. Defendant's Motion to Suppress Evidence

Before trial, defendant filed a motion to suppress evidence obtained through the warrantless search of the SDM from her Tahoe. The People filed an opposition, arguing that defendant had no reasonable expectation of privacy in the SDM; the instrumentality exception to the warrant requirement applied; and exclusion of SDM data was not a proper remedy for the purportedly unreasonable search and seizure.

The trial court conducted a hearing on the motion. It was undisputed that the search was conducted more than a year after the accident and was warrantless and without consent. Sergeant Berns testified that the Tahoe had been inspected by MAIT personnel in April 2009. He described the standard MAIT protocol for vehicle inspection: MAIT investigators inspect a vehicle from the ground up, focusing on acceleration, braking, steering, and suspension. In the inspection, MAIT investigators remove and inspect the wheels, tires, brake drums and calipers, and steering column. Sergeant Berns testified the SDM is included in the mechanical inspection of the vehicle because "it's an intricate [*sic.*, integral] component of the vehicle no different than a master cylinder." It was standard protocol to download the "black box," and MAIT did not seek court orders to do so. The MAIT manual did not discuss downloading the SDM, but MAIT personnel were trained to do so, and "the protocol was to download that module upon the mechanical inspection" by using a "box CDR retrieval system," specific software for Chevrolet Tahoes, and cables. Some MAIT teams download SDM data in every crash, although inland division MAIT does not.

To download the SDM on defendant's Tahoe, the investigators had to go under the driver's seat and cut through the carpet. The SDM controls deployment of the airbag and interrelates with the braking system, recording application of the brakes. MAIT inspection protocol includes download of the SDM data because it corroborates data the investigators look at when they check brakes, acceleration, and the steering column. The vehicle itself records the SDM data: "It doesn't care who's driving."

Sergeant Berns testified that MAIT could reconstruct the speed of the Tahoe without the SDM data but less accurately. Based on the postimpact

trajectories of both vehicles, the speed was obviously high, freeway speeds. Sergeant Berns did a "bench top" reconstruction and derived a speed of about 75 miles per hour.

Officer Wong testified he had worked as a MAIT member for 12 years. He testified that the CHP MAIT manual is very general and does not refer to SDM's. However, CHP protocol in the impound section is to download the SDM or any other component for inspection without a warrant. Officer Wong was aware of instances in other counties when a prosecutor had asked CHP to prepare a warrant to examine an SDM.

Based on his training and experience and the physical evidence from the scene and from photographs, Officer Wong did a speed calculation for the Tahoe before downloading the SDM data. He had calculated a minimum speed but could not arrive at a specific speed because of missing variables. The SDM data was important because speed was an issue in the case and for other reasons concerning the mechanical inspection of the Tahoe.

Following argument of counsel, the trial court stated, "my bet is [defendant] didn't even know she had this [SDM] in the car. . . . She had no subjective belief in . . . a privacy interest in an SDM that she probably didn't know existed." The trial court denied the motion to suppress, finding there was probable cause to download data from the SDM and no reasonable expectation of privacy in the SDM. The trial court further held: "Assuming the defendant had such knowledge and also had an expectation of privacy, it does not seem that such expectation would be reasonable. These computer modules were placed in cars as safety devices to gather information such as braking and speed, so as to be able to deploy the air bag at an appropriate time. They were not designed to gather any personal information nor were they designed or developed by the government to gather incrimination evidence from a driver. One cannot record communication of any kind on them. Indeed, they are not under the control of the individual driver at all."

The trial court further held: "[Defendant] had no reasonable expectation of privacy in her speed on a public roadway or when and if she applied her brakes shortly before the crash. If a witness observed those actions and testified to them, the evidence would be admitted. If an expert in accident reconstruction testified to them, that evidence would be admitted. There is no difference in an electronic witness whose memory is much more accurately preserved, both to exonerate and implicate defendants." The trial court denied defendant's motion.

## C. *General Fourth Amendment Principles*

■ The Fourth Amendment protects against unreasonable search and seizure those areas in which a person has a reasonable expectation of privacy.

(*Katz v. United States* (1967) 389 U.S. 347, 350–351 [19 L.Ed.2d 576, 88 S.Ct. 507]; *People v. Camacho* (2000) 23 Cal.4th 824, 831 [98 Cal.Rptr.2d 232, 3 P.3d 878].) To determine whether a person is entitled to Fourth Amendment protection, courts examine (1) whether the person, by his or her conduct, has exhibited an actual expectation of privacy and (2) whether the person's subjective expectation of privacy is one that society recognizes as reasonable. (*People v. Camacho, supra*, at pp. 830–831.) The defendant bears the burden of showing she had a legitimate expectation of privacy. (*Rawlings v. Kentucky* (1980) 448 U.S. 98, 104 [65 L.Ed.2d 633, 100 S.Ct. 2556].) In *Katz*, the Supreme Court stated: "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations.]" (*Katz v. United States, supra*, at pp. 351–352.)

### D. *Expectation of Privacy in Automobiles*

■ The United States Supreme Court has long held that the expectation of privacy is diminished in the automobile. (*Carroll v. United States* (1925) 267 U.S. 132, 153, 156 [69 L.Ed. 543, 45 S.Ct. 280] contraband may be seized from an automobile without a warrant if the officer has probable cause to believe the contraband was being transported in the automobile].) This automobile exception to the warrant requirement has been extended to encompass searches backed by reasonable belief in other offenses and warrantless inventory searches of impounded vehicles. (See, e.g., *Wyoming v. Houghton* (1999) 526 U.S. 295, 303 [143 L.Ed.2d 408, 119 S.Ct. 1297] [holding that when officers have probable cause to search a car, "the balancing of the relative interests weighs decidedly in favor of allowing searches of a passenger's belongings" that are capable of concealing the object of the search because "[p]assengers, no less than drivers, possess a reduced expectation of privacy with regard to the property that they transport in cars"]; *United States v. Ross* (1982) 456 U.S. 798, 806, fn. 8 [72 L.Ed.2d 572, 102 S.Ct. 2157] [stating that historically, persons have been "on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate's prior evaluation of those facts"], 823 [stating that "an individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband"]; *South Dakota v. Opperman* (1976) 428 U.S. 364, 368 [49 L.Ed.2d 1000, 96 S.Ct. 3092] [in upholding an inventory search, the court noted the diminished expectation of privacy in automobiles given "pervasive and continuing governmental regulation and controls," and "the obviously public nature of automobile travel"]; *Cardwell v. Lewis* (1974) 417 U.S. 583, 590 [41 L.Ed.2d 325, 94 S.Ct. 2464] [upholding the warrantless examination

of a vehicle's exterior based upon the lesser expectation of privacy].) But the Supreme Court has also recognized some legitimate expectation of privacy in vehicles deserving of protection. (See *Arizona v. Gant* (2009) 556 U.S. 332, 345 [173 L.Ed.2d 485, 129 S.Ct. 1710] [recognizing that a motorist's privacy interest in his vehicle, although less substantial than the privacy interest in his home, "is nevertheless important and deserving of constitutional protection"]; see also *United States v. Ortiz* (1975) 422 U.S. 891, 896 [45 L.Ed.2d 623, 95 S.Ct. 2585], fn. omitted ["A search, even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search."].)

As noted, defendant does not dispute that the police had probable cause for the search. The trial court specifically found "there was probable cause to download the SDM, because speed and braking are always relevant in determining the causes of a collision." The scope of a warrantless search authorized by the automobile exception is "no broader and no narrower than a magistrate could legitimately authorize by warrant." (*United States v. Ross, supra*, 456 U.S. at p. 825.) In *Ross*, the Supreme Court made clear that, even when the automobile exception applies, "[t]he scope of a warrantless search based on probable cause is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize." (*Id.* at p. 823, fn. omitted.) The scope of a warrantless search of an automobile "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." (*Id.* at p. 824.) Thus, the vehicle is protected by the Fourth Amendment, and an individual's reasonable expectation of privacy as to the vehicle yields only as to places where there is probable cause to search. The scope of the search did not exceed probable cause.

### E. *Instrumentality of the Crime Exception to Warrant Requirement*

■ As noted, research did not reveal any published California case addressing the constitutionality of the warrantless downloading of SDM data from a lawfully impounded vehicle. However, in a series of cases, the California Supreme Court has upheld vehicle searches on the basis that the vehicle was an instrumentality of the crime or was itself evidence. In *People v. Teale* (1969) 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564], the court upheld the warrantless seizure of an automobile when the officers had cause to believe that a murder victim had been shot in the automobile, and the court further found no Fourth Amendment violation in a criminalist's subsequent examination of the automobile, during which spatters of the victim's blood were found on the interior. (*People v. Teal, supra*, at pp. 508–511.) The court

held, " '[W]hen the police lawfully seize a car which is itself *evidence* of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures.' " (*Id.* at p. 508.)

In *North v. Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305], superseded by statute on another ground as stated in *People v. Loyd* (2002) 27 Cal.4th 997, 1000 [119 Cal.Rptr.2d 360, 45 P.3d 296], the police impounded the defendant's vehicle, which they believed had been used in a kidnapping, examined its interior without a warrant, and found the victim's fingerprints. In addition, they determined that the vehicle's tires and wheel span were consistent with impressions and measurements taken at the crime scene. (*North v. Superior Court, supra,* at p. 305.) The court upheld the postseizure examination of the vehicle, explaining that the vehicle had been seized contemporaneously with the defendant's arrest, "as evidence of the alleged kidnapping; the car was believed to be the very instrumentality used to commit the kidnapping." (*Id.* at p. 306, fn. omitted.)

Next, in *People v. Rogers* (1978) 21 Cal.3d 542 [146 Cal.Rptr. 732, 579 P.2d 1048], the court upheld the warrantless search of a van the police had impounded from the defendant upon his arrest for committing lewd acts on children because the police had cause to believe it had been an instrumentality of the crime. The court explained, "[W]hen officers, incidental to a lawful arrest, seize an automobile or other object in the reasonable belief that the object *is itself evidence* of the commission of the crime for which the arrest is made, any subsequent examination of the object for the purpose of determining its evidentiary value does not constitute a 'search' as that term is used in the California and federal Constitutions. [Citations.] In light of the evidence indicating that the pornographic snapshots were taken in the van and might depict the victims of the reported assaults, [the officer] clearly had reason to believe that the van was itself evidence of the crimes for which defendant had been arrested." (*Id.* at pp. 549–550, citing *North v. Superior Court, supra,* 8 Cal.3d 301, and *People v. Teale, supra,* 70 Cal.2d 497.)

In *People v. Griffin* (1988) 46 Cal.3d 1011 [251 Cal.Rptr. 643, 761 P.2d 103] (*Griffin*), the court upheld the taking of blood samples from the defendant's lawfully impounded truck. The court explained that "the truck in this case was itself evidence. The bloodstains that had soaked into the floorboard of the truck were clearly an appropriate subject of scientific examination and within the limits of the instrumentality exception." (*Id.* at pp. 1024–1025.) The court observed, "The propriety of a warrantless seizure and search where the vehicle is itself evidence or the instrumentality of a crime is implicit in a number of United States Supreme Court decisions as well." (*Id.* at p. 1025, collecting cases.)

■ In this case, defendant's vehicle was itself an instrumentality of the crime of vehicular manslaughter. Defendant concedes it was lawfully seized. Consistent with the California Supreme Court cases discussed above, the officers' "subsequent examination of the [vehicle] for the purpose of determining its evidentiary value [did] not constitute a 'search' as that term is used in the California and federal Constitutions. [Citations.]" (*People v. Rogers, supra*, 21 Cal.3d at p. 549.)

Defendant appears to argue, however, that the instrumentality exception no longer has validity, citing *People v. Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514] (*Minjares*) and *People v. Bittaker* (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659] (*Bittaker*). In *Minjares*, the People sought to justify the search of a closed container in the trunk of the defendant's vehicle under the instrumentality exception on the basis the car was an instrumentality of the defendant's crime of escape. The court responded, "In general, the belief that an automobile was used in the perpetration of a crime merely supplies the requisite probable cause to search the car. [Citation.] It does not justify its *warrantless* search. To the extent that there is a separate 'instrumentality' exception under either Constitution which in any way adds to the 'automobile' exception, it is inapplicable to the facts of this case." (*Minjares, supra*, at p. 421.) The court criticized the use of the instrumentality of a crime theory and held that the doctrine did not permit the search of a closed container within a vehicle. (*Id.* at p. 423.) The court further stated, "If there were any vitality to the 'instrumentality' exception as it applies to automobiles . . . it would be applicable only to a scientific examination of the object itself, for example for fingerprints, bloodstains, or the taking of tire impressions or paint scrapings. [Citation.]" (*Id.* at p. 422.)

Moreover, in *Griffin*, the court rejected the argument that it had repudiated the *People v. Teale* line of cases in *Minjares*: "We did not. We merely stated that the instrumentality exception was inapplicable on the facts before us in that case. [Citation.] Unlike the situation in *Minjares*, where the car trunk was merely a container of evidence, the truck in this case was itself evidence. The bloodstains that had soaked into the floorboard of the truck were clearly an appropriate subject of scientific examination and within the limits of the instrumentality exception." (*Griffin, supra*, 46 Cal.3d at p. 1025.)

■ Next, in *Bittaker*, a case that "antedate[d] the enactment of article I, section 28, of the California Constitution, which bars exclusion of relevant evidence in criminal proceedings" (*Bittaker, supra*, 48 Cal.3d at p. 1077, fn. 15), the court held that "while the instrumentality doctrine justifie[d] the officer's entry into the van to search for bloodstains and other evidence of [the victim's] rape, it may not in itself justify the search of the van for *other objects not attached to or part of the van itself.*" (*Id.* at p. 1077, italics

added.) Again, in this case, the search of the SDM involved a search of an object attached to and part of the truck itself, and thus, the search fell squarely within the instrumentality exception.

Defendant argues, however, that the recent case of *United States v. Jones* (2012) 565 U.S. ___ [181 L.Ed.2d 911, 132 S.Ct. 945] (*Jones*) indicates the police were required to obtain a warrant to search her vehicle. In *Jones*, the court held that the government's placement of a GPS tracking device on the undercarriage of a vehicle after a search warrant had expired, and the subsequent monitoring of the vehicle's movement and location for four weeks after that, violated the Fourth Amendment. (*Jones, supra,* at pp. ___–___ [132 S.Ct. at pp. 948–949].) The court based its decision on the common law theory of trespass in placing the GPS on the defendant's personal property, combined with the police attempt to obtain information. (*Id.* at p. ___ & fn. 5 [132 S.Ct. at p. 951 & fn. 5].) Moreover, the court expressly distinguished prior "beeper" tracking cases, *United States v. Knotts* (1983) 460 U.S. 276 [75 L.Ed.2d 55, 103 S.Ct. 1081] and *United States v. Karo* (1984) 468 U.S. 705 [82 L.Ed.2d 530, 104 S.Ct. 3296], on the basis that in those cases, beepers had been installed in containers while they were in the possession of third parties, with the then owners' permission. (*Jones, supra,* at pp. ___–___ [132 S.Ct. at pp. 952–953].) Here, the trespass theory underlying *Jones* has no relevance and, as the trial court aptly pointed out, the purpose of the SDM was not to obtain information for the police. Thus, *Jones* is not helpful to defendant.

### F. *Expectation of Privacy*

■ As the trial court pointed out, the specific data obtained from the SDM was the vehicle's speed and braking immediately before the impact. We agree that a person has no reasonable expectation of privacy in speed on a public highway because speed may readily be observed and measured through, for example, radar devices (e.g., *People v. Singh* (2001) 92 Cal.App.4th Supp. 13, 15 [112 Cal.Rptr.2d 74]), pacing the vehicle (e.g., *People v. Lowe* (2002) 105 Cal.App.4th Supp. 1, 5 [130 Cal.Rptr.2d 249]), or estimation by a trained expert (e.g., *People v. Zunis* (2005) 134 Cal.App.4th Supp. 1, 6 [36 Cal.Rptr.3d 489]). Similarly, a person has no reasonable expectation of privacy in use of a vehicle's brakes because statutorily required brake lights (Veh. Code, § 24603) announce that use to the public. Thus, defendant has not demonstrated that she had a subjective expectation of privacy in the SDM's recorded data because she was driving on the public roadway, and others could observe her vehicle's movements, braking, and speed, either directly or through the use of technology such as radar guns or automated cameras. In this case, technology merely captured information defendant knowingly exposed to the public—the speed at which she was

travelling and whether she applied her brakes before the impact. (See, e.g., *Smith v. Maryland* (1979) 442 U.S. 735, 741–745 [61 L.Ed.2d 220, 99 S.Ct. 2577] [installation of a pen register at the telephone company's central offices, at the request of police, did not constitute a "search" within the meaning of the 4th Amend. because the pen register merely recorded the telephone numbers dialed from the petitioner's home, and the petitioner could "claim no legitimate expectation of privacy," because "[w]hen he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business."].)

We conclude there was no Fourth Amendment violation in the admission of SDM evidence.

### G. Harmless Error

Even if we presume for purposes of argument that the search was unlawful, we would also conclude that any error in admitting the evidence from the SDM was harmless in light of the overwhelming evidence of defendant's guilt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).)

The first element of gross vehicular manslaughter while intoxicated is that the defendant drove under the influence of alcohol or with a blood-alcohol level of 0.08 percent or higher. Defendant's blood-alcohol level was measured as 0.20 percent at 2:58 a.m., and considering the alcohol burnoff rate, was 0.23 percent at the time of the collision. The SDM data was irrelevant to that element of the crime.

The second element of the crime is that while driving under the influence, defendant committed an infraction. Here, the prosecutor argued that defendant had committed two infractions: violating the maximum speed law and crossing a divided highway. Undisputed evidence, independent of the SDM data, established that defendant had violated the law by crossing over two sets of double yellow lines in the median of Knabe and had been driving the wrong way in the northbound lanes at the time of the collision. The import of the challenged SDM evidence was to establish defendant's speed before the collision and that she failed to apply her brakes. We note that Officer Wong testified, based on his "training and experience with collision reconstruction," that "the photographs that [he] saw of the damage to both vehicles" was consistent with "the Tahoe traveling at 76 miles per hour."

The third element of the crime is that defendant committed the infraction with gross negligence. "[G]ross negligence can be shown by the *manner* in

which the defendant operated the vehicle, that is, the overall circumstances (rather than the mere fact) of the traffic law violation." (*People v. Von Staden* (1987) 195 Cal.App.3d 1423, 1427 [241 Cal.Rptr. 523].) Those overall circumstances include the defendant's intoxication and the manner in which the defendant drove. (*Ibid.*) In that case, the court upheld the jury's finding of gross negligence when the defendant "ignored his host's urging that he not drive while intoxicated"; "his level of intoxication was very high" (i.e., 0.16 percent blood-alcohol level three hours after the accident, and an estimated 0.22 percent at the time of the accident); and he exceeded the maximum safe speed by 30 miles per hour. (*Id.* at pp. 1426, 1428.) In *People v. Bennett* (1991) 54 Cal.3d 1032 [2 Cal.Rptr.2d 8, 819 P.2d 849], the Supreme Court cited *People v. Von Staden* with approval and held, "The jury should . . . consider all relevant circumstances, including level of intoxication, to determine if the defendant acted with a conscious disregard of the consequences rather than with mere inadvertence." (*Bennett, supra,* at p. 1038.) In *Bennett,* the court upheld the jury's finding of gross negligence when the defendant had a blood-alcohol level two hours after the accident of 0.20 percent, and he had been driving 10 miles over the speed limit. (*Id.* at p. 1035.) Here, Palumbo testified defendant was clearly under the influence, and he tried to convince her to let him drive home. Instead, she got into the car and "pretty much" locked herself in. He also told an investigator Keppler had offered to drive defendant home. And even though the issue was contested, the jury could reasonably find that defendant, as a former EMT and ambulance driver, had greater awareness than most members of the general public of the consequences of drinking and driving. Abundant evidence supported the jury's finding of gross negligence.

The fourth element of the crime is that defendant's grossly negligent conduct caused the victim's death. Causation was not at issue in this case.

In short, even in the absence of the SDM evidence, the jury would have convicted defendant. Any error in admitting that evidence was necessarily harmless. (*Chapman, supra,* 386 U.S. at p. 24.)

H. *Vehicle Code Section 9951*

■ Defendant appears to argue that a court order was required to download or retrieve information from the SDM in her Tahoe under Vehicle Code section 9951.[5] That statute "applies to all motor vehicles manufactured

---

[5] Manufacturers of vehicles equipped with SDM's must disclose their existence in the owner's manual. (Veh. Code, § 9951, subd. (a).) Subdivision (c) of that statute permits the downloading or retrieval of information from such devices only under the following circumstances: "(1) The registered owner of the motor vehicle consents to the retrieval of the information. [¶] (2) In response to an order of a court having jurisdiction to issue the order. [¶]

on or after July 1, 2004." (Veh. Code, § 9951, subd. (f).) Thus, on its face, the statute does not apply to defendant's 2002 Tahoe. Moreover, even if it did apply, we assess prejudice from the violation of a state statute under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]). Because we have concluded that defendant suffered no prejudice even under the more stringent *Chapman* standard, a fortiori, defendant suffered no prejudice under *Watson*.

## IV. DISPOSITION

The judgment is affirmed.

McKinster, J., and Richli, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 17, 2013, S209134.

---

(3) For the purpose of improving motor vehicle safety, . . . and the identity of the registered owner or driver is not disclosed in connection with that retrieved data. . . . [¶] (4) The data is retrieved by a licensed new motor vehicle dealer, or by an automotive technician . . . for the purpose of diagnosing, servicing, or repairing the motor vehicle."