**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 27, 2018**

# In the Court of Appeals of Georgia

A18A0500. MOBLEY v. THE STATE.

MERCIER, Judge.

On December 15, 2014, the vehicle driven by Victor Lamont Mobley collided with a vehicle driven by W. M. W. M. and the passenger in his vehicle, C. F., were killed in the collision. Mobley was charged with reckless driving, two counts of homicide by vehicle in the first degree (alleging that he caused the deaths of W. M. and C. F. through the act of reckless driving), and speeding (alleging that he drove a vehicle at a speed of 97 miles per hour in a 45-mile-per-hour zone). Mobley moved to suppress evidence that was obtained from the airbag control module[1] ("ACM") in the vehicle he was driving, which showed that the vehicle was traveling at a speed of

---

[1] The ACM is also referred to in the record as an "electronic control module" or "ECM." An ACM is a type of event data recorder. For the purposes of this opinion, we will refer to the module as an "ACM."

97 miles per hour five seconds before airbag deployment. After conducting a hearing the trial court denied his motion. In its order denying Mobley's motion to suppress, the trial court found that it did not have to reach the issue of whether a search warrant was required to access the data from the ACM in the vehicle driven by Mobley, because a search warrant was obtained the day after the data was accessed and the data in the ACM would have inevitably been discovered "when the ACMs were properly removed from the vehicle pursuant to the search warrant[]." Following a bench trial on June 6, 2017, Mobley was found guilty on all counts. He appeals from the judgment of conviction entered in this case.

1. Mobley contends that the trial court erred in denying his motion to suppress. He argues that a search warrant was required for law enforcement to access the data in the ACM in the vehicle he was driving because he had a subjective expectation of privacy in the data; that a law enforcement officer misled the magistrate judge by applying for a search warrant without indicating that the information sought had already been obtained; that the trial court erred in relying on the inevitable discovery exception to the warrant requirement; and that the exigent circumstances exception to the warrant requirement did not apply. Whether a search warrant is required to retrieve the data from a vehicle's ACM is an issue of first impression in Georgia.

2

Because we find that a search warrant was not required here, we affirm Mobley's convictions. See generally *Fincher v. State*, 276 Ga. 480, 481 (2) (578 SE2d 102) (2003) ("[A] trial court's ruling on a motion to suppress will be upheld if it is right for any reason.").

OCGA § 17-5-30 (a) pertinently provides that "[a] defendant aggrieved by an unlawful search and seizure may move the court . . . to suppress as evidence anything so obtained on the grounds that . . . [t]he search and seizure without a warrant was illegal[.]" OCGA § 17-5-30 (b) pertinently provides that "the burden of proving that the search and seizure were lawful shall be on the [S]tate."

> When the evidence at a suppression hearing is uncontroverted and the credibility of witnesses is not in question, we conduct a de novo review of the trial court's application of the law to the undisputed facts. To the extent an issue concerns a mixed question of fact and law, we accept the trial court's findings on disputed facts and witness credibility unless they are clearly erroneous, but independently apply the law to the facts.

*State v. Wright*, 344 Ga. App. 881 (812 SE2d 86) (2018) (footnote omitted).

Here, the evidence at the hearing on the motion to suppress included testimony from three law enforcement officers with the Henry County Police Department who

3

were involved in the investigation of the collision (Sergeant D. G. , Investigator J. H. , and Officer B. T. ).

Sergeant D. G. assisted with the investigation immediately following the collision and contacted Investigator J. H. to retrieve the data from the vehicle's ACMs at the scene of the collision.[2] Investigator J. H. downloaded the data from the ACMs in Mobley's and W. M.'s vehicles at the collision scene. The next day, Officer B. T. applied for and obtained a warrant to search and seize the ACMs, which devices were in the vehicles at an impound facility. All three officers testified that at the time of their investigation of the collision, they believed that they were not required to obtain a search warrant in order to retrieve data from the ACMs while the vehicles and the officers were still at the scene of the collision.

Sergeant D. G. testified as follows. The collision occurred on a Monday at approximately 1:00 p.m. The magistrate court was open when officers began their investigation and they could have obtained a search warrant on that day. Witnesses to the collision told Sergeant D. G. at the scene that W. M.'s vehicle had "pulled out" in front of the vehicle driven by Mobley. None of the witnesses provided Sergeant D.

_____

[2] The accessing or retrieving of data from ACMs was also referred to in the hearing as "downloading" the data and "imaging" the ACM or the vehicle.

4

G. with any information about the speeds of the vehicles. The speed limit at the location of the collision was 45 miles per hour, and based on the evidence on the roadway, it appeared to Sergeant D. G. that the vehicle speed at the time of the collision was 45 to 50 miles per hour.

It was not uncommon for Sergeant D. G. to decide to download the information from ACMs at a collision scene as he did in this case, particularly when the collisions involved serious injuries or fatalities. He testified that in this case, "[a]s in any other fatality that we work, we'll try to investigate the whole thing through and through. So the crash . . . appeared to be a 45- to 50-something-mile-an-hour crash, but with two people being deceased, we knew that we needed to go farther with the investigation on it." He further explained that this was the case because "two people [were] dead" and investigators needed "to find out if there [were] any other extenuating circumstances that caused the collision itself." Sergeant D. G. chose to download the ACM data at the collision scene without first obtaining a search warrant because "we were still on-scene" of a fatal collision and "we had the resources available at the time . . . to go ahead and just gather all the data that we could while we're on-scene." A short time later, the vehicles were towed from the scene by a towing service, and officers instructed the towing service to hold the vehicles for investigation.

Investigator J. H. testified as follows. He arrived at the scene of the collision at approximately 2:00 p.m. on the day that the collision occurred. He confirmed that both vehicles involved in the collision were "able to be imaged," and he obtained the data from the ACMs in both vehicles while the vehicles were still at the collision scene. He then provided the data he obtained to another investigator. Investigator J. H. testified that he could have used the same procedure to download the information the day after the accident, after a search warrant was obtained. Officers removed the ACMs from both vehicles at the towing company's lot on the day after the collision, placed the devices into evidence storage, and did not access the data again.

Officer B. T. testified as follows. He assisted in the investigation of the collision on December 16, 2014, the day after the collision occurred. On December 16, 2014, he completed the affidavit for a search warrant for the ACMs based on information provided to him by other officers. The purpose of obtaining the search warrant was to remove the ACMs from the vehicles and place them "into property and evidence." In applying for the search warrant, he did not tell the magistrate that law enforcement officers had already collected the data from the ACMs. He further testified that, if the data had not been downloaded from the ACMs at the scene of the

6

collision, he would have obtained a search warrant and downloaded the data at the impound lot.

The evidence demonstrates that the ACM in Mobley's vehicle was designed to capture data related to a collision or airbag deployment. Accessing the data in the ACMs in the vehicles involved in this case required special equipment, and interpretation of some of the data required special training. Specifically, obtaining the data from an ACM required a "crash data recovery kit" ("CDR"), which involved the use of a laptop, a computer program, an interface box, and a connection cable. Reading the ACM data required special training because some of it was recorded in hexadecimal format (for engineers).

Officer B. T. confirmed that the data captured by the ACM included the status of several aspects of the vehicle at or immediately preceding airbag deployment, including speed, engine speed, brake status, throttle position, engine revolutions, driver's seat belt status and brake switch status, as well as time from maximum deceleration to impact, time from vehicle impact to airbag deployment, and diagnostic information on the vehicle's systems. A copy of the printed report of the ACM data captured from Mobley's vehicle was introduced at the bench trial, and included charts containing several sets of pre-collision data set forth at specific intervals, including

7

"Accelerator Pedal, % Full," "Engine Throttle, % Full," "Stability Control," "Raw Manifold Pressure," "Yaw Rate," and "Wheel Speed." In the indictment and in its opening statement, the prosecution relied upon Mobley's "high rate of speed" to prove its case, which evidence was obtained from the ACM.

"The Fourth Amendment proscribes all unreasonable searches and seizures, and searches conducted without prior judicial approval are per se unreasonable under the Fourth Amendment, subject to specifically established and well-delineated exceptions." *Teal v. State*, 282 Ga. 319, 322-323 (2) (647 SE2d 15) (2007) (citation omitted). "[A]n individual may challenge the legality of a search under the Fourth Amendment . . . only if he or she has manifested a subjective expectation of privacy in the object of the challenged search and society is willing to recognize that expectation as reasonable." *Bowling v. State*, 289 Ga. 881, 883 (2) (a) (717 SE2d 190) (2011) (citations and punctuation omitted) (citing *Kyllo v. United States*, 533 U. S. 27, 33 (II) (121 SCt 2038, 150 LE2d 94) (2001)). "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States*, 389 U. S. 347, 351-352 (88 SCt 507, 19 LE2d 576) (1967) (citations omitted).

8

"A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *Sevilla-Carcamo v. State*, 335 Ga. App. 788, 794 (3) (fn. 25) (783 SE2d 150) (2016) (citation omitted). "A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Devega v. State*, 286 Ga. 448, 453 (4) (d) (689 SE2d 293) (2010) (citation omitted).

Mobley argues that an ACM is analogous to a cell phone with regard to the Fourth Amendment right to privacy. In *Riley v. California*, 134 SCt 2473 (189 LE2d 430) (2014), which he cites, the Supreme Court of the United States held that there is a reasonable expectation of privacy in the contents of a cell phone, and a warrant generally is required to search such contents, even when the phone is seized incident to arrest. *Riley*, supra at 2493 (III) (C), 2495 (IV). In balancing the degree to which such a search intrudes upon an individual's privacy and the degree to which the search is needed for the promotion of legitimate governmental interests (the test for a warrantless search incident to arrest), the *Riley* Court found that a search of the digital information on a cell phone does not further the government interests of officer safety and prevention of evidence destruction, and implicates substantially greater individual privacy interests than a brief physical search. Id. at 2484-2485 (III).

9

This is because "[m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans the privacies of life[.]" Id. at 2494-2495 (IV) (citation and punctuation omitted).

Mobley also contends that we should follow the reasoning employed by a Florida appellate court, which held (in a divided opinion) that a search warrant was required to access ACM data in an impounded vehicle. *State v. Worsham*, 227 So3d 602, 605, 608 (42 Fla. L. Weekly D 711) (Fla. 4th DCA 2017) (certiorari denied in *Florida v. Worsham*, (138 SCt 264, 199 LE2d 125) (2017)). The *Worsham* court found that ACMs "document more than what is voluntarily conveyed to the public and the information is inherently different from the tangible 'mechanical' parts of a vehicle." Id. at 606. Citing *Riley*, supra and analogizing the ACM to a cell phone, the *Worsham* court reasoned that because the recorded data is not exposed to the public, and because the data is difficult to retrieve and interpret, there is a reasonable expectation of privacy in the data. Id. at 604, 606.

Meanwhile, an appellate court in California reached the opposite conclusion on this question in *People v. Diaz*, 213 Cal. App. 4th 743 (153 Cal. Rptr. 3d 90) (2013). The *Diaz* court held that there was no reasonable expectation of privacy in the speed and braking data taken from the vehicle's ACM in that case, because "others

10

could observe [the] vehicle's movements, braking, and speed, either directly or through the use of technology such as radar guns or automated cameras." Id. at 757-758 (III) (F). The *Diaz* court noted that "technology merely captured information defendant knowingly exposed to the public[.]" Id. (citation omitted). See also *People v. Christmann* (3 Misc.3d 309, 315, 776 N.Y.S.2d 437) (Just. Ct. 2004) (the immediate warrantless download of information from the defendant's ACM did not violate the defendant's Fourth Amendment rights).

We find that, under the circumstances in this case, Mobley did not have a reasonable expectation of privacy in the data from his vehicle's ACM. See generally *Bowling*, supra. While an outside observer cannot ascertain the information regarding the use and functioning of a vehicle with the same level of precision as that captured by the ACM, there are outward manifestations of the functioning of some of the vehicle's systems when a vehicle is operated on public roads. For example, a member of the public can observe a vehicle's approximate speed; observe whether a vehicle's brakes are being employed by seeing the vehicle slow down or stop or the brake lights come on, by hearing the sounds of sudden braking; and observe whether the driver is wearing a seatbelt. There is no reasonable expectation of privacy in such information because an individual knowingly exposes such information to the public.

11

See generally *Devega*, supra (warrantless monitoring of defendant's cell phone location did not violate the Fourth Amendment because it revealed the same information that could be obtained through visual surveillance).

Moreover, the types of information contained in Mobley's ACM (as described in the hearing on the motion to suppress) are distinguishable from the types of personal information contained in a cell phone and protected by the Fourth Amendment as discussed in *Riley*, supra. Information regarding the mechanical functioning of the vehicle and its systems is qualitatively different from photographs, financial information, and other such personal data that may be found on a cell phone. We find that Mobley did not have a reasonable expectation of privacy with respect to the data captured by his vehicle's ACM, and the retrieval of the data was therefore not a search or seizure protected by the Fourth Amendment. See *Bowling*, supra.

We recognize that the breadth of information captured by and obtained from an ACM can vary over time, and amongst vehicle manufacturers. For example, an ACM could retain global positioning system information, possibly implicating the Fourth Amendment. The U. S. Supreme Court has held that the government's installation of a GPS tracking device to an individual's vehicle, and the subsequent use of that device to monitor the vehicle's movements on public streets constitutes

12

a search within the meaning of the Fourth Amendment. *United States v. Jones*, 565 U. S. 400, 404 (II) (A) (132 SCt 945, 181 LE2d 911) (2012); see *Hamlett v. State*, 323 Ga. App. 221, 227 (1) (a) (753 SE2d 118) (2013). As recognized in Justice Sotomayor's concurrence in *Jones*, "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Jones*, supra at 415 (citation omitted). The evidence in this case does not demonstrate that the ACM in Mobley's vehicle was capable of GPS monitoring or the recording of his movements between various locations.

Nor does the evidence here indicate that the ACM in Mobley's vehicle recorded information on a long-term basis. Rather, the evidence shows that the purpose of the ACM is to capture information regarding collisions or airbag deployments, that the ACM generally only starts recording information when an event, such as a collision, "triggers" it to record, that the ACM continuously overwrites "nondeployable" events, and that the ACM only saves data permanently when a collision has caused the vehicle's airbags to deploy. The collision in this case was a "deployment event" for both vehicles. The only data shown to have been saved

13

permanently by Mobley's ACM was the data collected just before and at the time of the airbag deployment.

We therefore limit our holding to the particular facts of this case, and note that future treatment of this issue will likewise depend on the specific facts of the cases under consideration. As such, we reiterate the strong preference for searches to be conducted pursuant to a warrant, see *Jones v. State*, 337 Ga. App. 545, 548 (1) (788 SE2d 132) (2016), and caution law enforcement officers faced with an investigative need to obtain data from a vehicle's ACM to err on the side of caution by obtaining a search warrant before retrieving that information.

2. As a result of our holding on this issue, we need not address Mobley's remaining contentions.

*Judgment affirmed. Dillard, C. J., and Doyle, P. J., concur specially.*

A18A0500.  MOBLEY v. THE STATE.

DILLARD, Chief Judge, concurring specially.

I agree that Mobley's convictions should be affirmed, but I write separately for two reasons. First, because the trial court correctly concluded that the data from the ACM in Mobley's vehicle would inevitably have been lawfully discovered, it is unnecessary for us to address whether the Fourth Amendment prohibits a warrantless seizure of that data. Nevertheless, I feel compelled to echo the majority's admonition to law enforcement that the better course of action in cases like this is to obtain a warrant before retrieving ACM data. Indeed, as Fourth Amendment jurisprudence struggles to keep pace with technological advances and the consequent blurring between our private and public lives, novel cases (such as this one) will become increasingly common. And faced with such rapidly evolving challenges affecting the way in which investigations are conducted and evidence is obtained, I agree with the majority that law enforcement will be better served by erring on the side of caution and obtaining a search warrant in such cases.

My analysis begins, of course, with the Fourth Amendment to the United States Constitution, which provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated."[1] And the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."[2] One such exception is the inevitable-discovery doctrine, which "allows admission of evidence that was discovered as a result of police error or misconduct if the State establishes by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, without reference to the police error or misconduct."[3] More specifically, there must be a reasonable probability that "the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable

---

[1] U.S. Const. amend. IV; *see also* Ga. Const. Art. 1, § 1, ¶ XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched or the persons or things to be seized.").

[2] *State v. Slaughter*, 252 Ga. 435, 436 (315 SE2d 865) (1984); *accord Foster v. State*, 321 Ga. App. 118, 118-19 (1) (741 SE2d 240) (2013).

[3] *Teal v. State*, 282 Ga. 319, 323-24 (2) (647 SE2d 15) (2007); *accord State v. Kaulbach*, 331 Ga. App. 610, 616 (2) (771 SE2d 245) (2015).

2

were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct."[4]

Here, the officers were called to the scene of an automobile collision that resulted in two fatalities. And although Sergeant D. G.'s initial impression was that Mobley had not significantly exceeded the speed limit (if at all), he also noted that the tragic circumstances surrounding the accident were such that a thorough investigation was still required. Toward that end, both vehicles were towed away, and the officers instructed the towing service to hold the vehicles for investigation. This was not unusual. It was a common practice for these officers to secure ACM data from vehicles involved in serious collisions, even at the scene. Additionally, Officer B. T. testified that if the ACM data had not been obtained at the scene, he would have sought a search warrant and collected such data from the vehicle at the impound lot. Thus, given these particular circumstances, the trial court correctly ruled that there was probable cause to retrieve the ACM data from Mobley's vehicle and, therefore, the data would have inevitably been discovered.[5]

---

[4] *Foster*, 321 Ga. App. at 120 (1) (punctuation omitted); *accord Schweitzer v. State*, 319 Ga. App. 837, 839 (738 SE2d 669) (2013).

[5] *See Teal*, 282 Ga. at 326 (2) (holding that an investigation taking place before the illegal seizure and yielding information that would serve as the basis for a search

3

Notwithstanding the propriety of the trial court's ruling, I reiterate the majority's admonition that the better practice is for law enforcement to seek a warrant prior to any search or seizure in this type of case. Indeed, a brief glance into the state of flux our Fourth Amendment jurisprudence currently inhabits demonstrates that repeating this exhortation is warranted.

In *Katz v. United States*,[6] the Supreme Court of the United States held that "[t]he Fourth Amendment protects people, not places," explaining that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection," but "what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."[7] And

warrant could be the "lawful means" that would have led to the inevitable discovery of the illegally seized evidence); *Foster*, 321 Ga. App. at 120 (1) (holding that contraband found in defendant's purse would have been inevitably discovered during warrantless search based on arresting officer's having had probable cause to search the vehicle due to smelling marijuana in the subject vehicle); *Schweitzer*, 319 Ga. App. at 839 (holding that evidence of contraband found in arrested defendant's purse was admissible because discovery of such was inevitable due to officer's valid practice of inventorying personal possessions upon booking).

[6] 389 U.S. 347 (88 SCt 507, 19 LE2d 576) (1967).

[7] *Id.* at 351-52 (citations and punctuation omitted). I confess that, notwithstanding my increasingly Burkean tendencies as a jurist, I share Justice Thomas's view that the *Katz* test has "no basis in the text or history of the Fourth Amendment," and "invites courts to make judgments about policy, not law." *Carpenter v. United States*, ___ U.S. ___ (2018 WL 3073916 at * 30) (June 22, 2018)

4

here, even though I believe it is unnecessary to reach the issue, I agree with the majority's determination that Mobley had no reasonable expectation of privacy in the speed and braking data obtained from his vehicle's ACM because "others could observe [his] vehicle's movements, braking, and speed, either directly or through the use of technology such as radar guns or automated cameras."[8] Suffice it to say, this sort of data—while far more precise (and at times damning) than the naked eye—is hardly comparable to the type of sensitive personal information often contained on a cell phone.[9] That said, with technology of this nature rapidly developing, it is easy to imagine future cases presenting much thornier questions. For instance, had the ACM in this case included detailed GPS tracking information or other personal

---

(Thomas, J., dissenting); *id*. at 33 ("By defining 'search' to mean 'any violation of a reasonable expectation of privacy,' the *Katz* test misconstrues virtually every one of [the words contained in the Fourth Amendment]."); *see also Katz v. United States: The Untold Story*, 40 McGeorge L. Rev. 13, 18 (2009). But unlike Justice Thomas, I am bound by *Katz*, so my musing here is nothing more than a tip of the cap to his notable adherence to the original public meaning of the Fourth Amendment.

[8] *People v. Diaz*, 213 Cal. App. 4th 743, 757-58 (III) (F) (153 Cal. Rptr. 3d 90) (2013). *But see State v. Worsham*, 227 So3d 602, 603-08 (Fla. 4th DCA 2017) (holding that defendant had a reasonable expectation of privacy in the information captured by the event data recorder). Needless to say, I find Judge Forst's well-reasoned dissent in *Worsham* far more persuasive than the majority opinion in that case. *See generally id.* at 608-12 (Forst, J., dissenting).

[9] Although Mobley maintains that at least some of the data on his vehicle's ACM was "not visible to the public," that type of data is not at issue in this case.

details of Mobley's everyday life, a warrantless search may have run afoul of the Fourth Amendment's protection of his reasonable expectation of privacy.[10]

But even setting aside concerns of one's reasonable expectation of privacy as it pertains to law enforcement tracking every breath we take and every move we make,[11] the physical intrusion into a suspect's vehicle to obtain ACM data may also run afoul of the Fourth Amendment as a common law trespass. Indeed, it is beyond dispute that "a vehicle is an 'effect' as that term is used in the Amendment."[12] And under a "property-based" theory of the Fourth Amendment, the Supreme Court of the

[10] *See Carpenter*, ___ U.S. ___ (III), (IV) (2018 WL 3073916 at * 9, 13) (holding that an individual maintains a legitimate expectation of privacy, for Fourth Amendment purposes, in the record of his physical movements as captured through cell-site location information, and therefore, government must generally obtain a search warrant supported by probable cause before acquiring that information from a wireless carrier); *Riley v. California*, ___ U.S. ___ (IV) (134 SCt 2473, 2494-95, 189 LE2d 430) (2014) (holding that a person has a reasonable expectation of privacy in the contents of a cell phone, and thus under most circumstances law enforcement must obtain a warrant prior to searching same given that "[m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life[.]' The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought." (citations and punctuation omitted)).

[11] *See* THE POLICE, *Every Breath You Take*, on SYNCHRONICITY (A&M Records 1983).

[12] *United States v. Jones*, 565 U.S. 400, 404 (II) (A) (132 SCt 945, 181 LE2d 911) (2012).

United States has held that law enforcement's brief physical intrusion into a vehicle constitutes a "search" within the meaning of the Fourth Amendment.[13] As a result, arguments like these may "vindicate Fourth Amendment interests even where *Katz* arguments do not."[14]

Consequently, law enforcement will find it increasingly tricky to navigate the crossroads of ever-advancing technology and personal privacy as they relate to Fourth Amendment prohibitions. And this difficulty is only exacerbated by the fact that the decisions of the Supreme Court of the United States establish that warrantless searches are typically unreasonable where "a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing."[15] But as the Supreme Court emphasized once again in *Carpenter v. United States*, there remains a tried and true means of safely traversing these crossroads when law enforcement's specific

---

[13] *See id.* at 404-05 (II) (A) (noting that in light of the fact that, initially, "our Fourth Amendment jurisprudence was tied to common-law trespass," installation of a GPS device on a suspect's vehicle and use of that device to monitor the vehicle's movements constitutes a search and, thus, in most cases requires a warrant).

[14] *Carpenter*, 2018 WL 3073916 at * 68 (Gorsuch, J., dissenting). *Cf.* Driver Privacy Act of 2015, S. 766, 114th Cong. § 24302 (declaring that information collected by event data recorders, such as how fast a car was traveling prior to a crash and whether the driver applied the brakes, belongs to the owner of the vehicle).

[15] *Id.* at *13 (III) (B) (punctuation omitted).

obligations under the Fourth Amendment are in doubt—get a warrant.[16] This default

position seems especially wise in light of the "equilibrium-adjustment" the Supreme

Court of the United States recently made in *Carpenter*.[17] And while obtaining a

warrant may not always lend itself to expediency, our republic's Fourth Amendment

jurisprudence has "historically recognized that the warrant requirement is 'an

important working part of our machinery of government,' not merely an

inconvenience to be somehow 'weighed' against the claims of police efficiency."[18]

I am confident the vast majority of our law enforcement officers will err on the side

of caution and liberty, and get a warrant in cases like the one before us. The law

---

[16] *See id*.

[17] *See* Orin S. Kerr, *First Thoughts on Carpenter v. United States*, Volokh Conspiracy (June 22, 2018) https://reason.com/volokh/2018/ 06/22/first-thoughts-on-carpenter-v-united-sta ("If technology gives the government too much new power that can be abused based on old rules, the Court expands legal protection to restore old levels of power and limit abuses. On the flip side, if technology threatens to narrow government power too much that can unduly limit the government's ability to solve crimes under old rules, the Court shrinks legal protection to restore old levels of power and ensure the government can still solve enough cases. In *Carpenter*, the Chief Justice is very clear that this is what is going on. Throughout the opinion, he roots his analysis in the idea that cell-site surveillance is a new tool that gives the government new power that can be abused, and that the law must change course to ensure that the government doesn't get too much power from a mechanical application of the old rules.").

[18] *Riley*, 134 SCt at 2493 (IV) (punctuation omitted).

8

always seems to be several steps behind technology, and this approach strikes me as the most prudent course of action going forward.

A18A0500. MOBLEY v. THE STATE.

Doyle, Presiding Judge, concurring specially.

Because I agree that Mobley's convictions should be affirmed, I concur specially and in the judgment. I write separately, however, because I do not believe that we need to decide whether the Fourth Amendment prohibits the seizure of data from the ACM in the vehicle Mobley was driving absent a warrant or his consent because the data would have been available to the State under the properly obtained search warrant.

"The exclusionary rule prohibits introduction [of] evidence . . . seized during an unlawful search . . . or that is otherwise acquired as an indirect result of the unlawful search, up to the point where the taint is dissipated by its attenuated connection with the unlawful search. . . ."[1] When officers also secure a properly issued search warrant to obtain the challenged evidence, "the appropriate question is whether the evidence at issue has been [obtained] by exploitation of th[e] illegality or instead by [a warrant] sufficiently distinguishable to be purged of the primary

_____

[1] (Citations and punctuation omitted.) *Teal v. State*, 282 Ga. 319, 323 (2) (647 SE2d 15) (2007).

taint."[2] Therefore, when the State shows by a preponderance of the evidence "that the information ultimately or inevitably would have been discovered by lawful means [i.e., a warrant], without reference to the police error or misconduct," the exclusionary rule does not apply.[3]

Here, even if the roadside scan of the ACM was illegal, the evidence authorized the trial court to find that the data obtained therefrom was not used by the officers to secure the search warrant, the warrant was obtained in the regular course of the continuing investigation, and the ACM's data inevitably would have been available to police pursuant to the warrant they later lawfully obtained.[4] Accordingly, the trial court did not err by denying the motion to suppress.

---

[2] (Punctuation omitted.) Id., quoting *Wong Sun v. United States*, 371 U. S. 471, 488 (83 SCt 407, 9 LE2d 441) (1963).

[3] See *Teal*, 282 Ga. at 326-327 (2).

[4] See id. at 323-324 (2).